IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| SHANNON DAVES, ) | |
| SHAKENA WALSTON, ) | |
| ERRIYAH BANKS, ) | |
| DESTINEE TOVAR, ) | |
| PATROBA MICHIEKA, ) | |
| JAMES THOMPSON, ) | |
| ) | |
|      On behalf of themselves and all ) | |
|      others similarly situated, ) | |
| ) | |
|         Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) Case No. 3:18-cv-154 | |
| DALLAS COUNTY, TEXAS, ) | |
| ) | |
| SHERIFF MARIAN BROWN, ) | |
| ) | |
| TERRIE MCVEA, ) | |
| LISA BRONCHETTI, ) | |
| STEVEN AUTRY, ) | |
| ANTHONY RANDALL, ) | |
| JANET LUSK, ) | |
| HAL TURLEY, ) | |
|      Dallas County Magistrates ) | |
| ) | |

ERNEST WHITE (194TH),
HECTOR GARZA (195TH),
TERESA HAWTHORNE (203RD),
TAMMY KEMP (204TH),
JENNIFER BENNETT (265TH),
AMBER GIVENS-DAVIS (282ND),
LIVIA LIU FRANCIS (283RD)
STEPHANIE MITCHELL (291ST),
BRANDON BIRMINGHAM (292ND),
TRACY HOLMES (363RD),
ROBERT BURNS (NO. 1),
NANCY KENNEDY (NO. 2),
GRACIE LEWIS (NO. 3),
DOMINIQUE COLLINS (NO. 4),

CARTER THOMPSON (NO. 5),                              )
JEANINE HOWARD (NO. 6),                               )
STEPHANIE FARGO (NO. 7),                              )
    Judges of Dallas County Criminal District Courts    )
                                                      )
DAN PATTERSON (NO. 1),                                )
JULIA HAYES (NO. 2),                                  )
DOUG SKEMP (NO. 3),                                   )
NANCY C. MULDER (NO. 4),                              )
LISA GREEN (NO. 5),                                   )
ANGELA KING (NO. 6),                                  )
ELIZABETH CROWDER (NO. 7),                            )
TINA YOO CLINTON (NO. 8),                             )
PEGGY HOFFMAN (NO. 9),                                )
ROBERTO CANAS, JR. (NO. 10),                          )
SHEQUITTA KELLY (NO. 11),                             )
    Judges of Dallas County Criminal Courts at Law       )
                                                      )
    Defendants.                                          )
_____)

## COMPLAINT—CLASS ACTION

1.      This case is about Dallas County jailing some of its poorest people because they cannot afford to make a monetary payment.   Named Plaintiff Shannon Daves is currently unemployed and homeless.  She was arrested for a misdemeanor offense on Wednesday, January 17, and Dallas County has detained her since then solely because she cannot afford to pay a $500 money bail.  Because Ms. Daves is transgender and cannot afford to purchase her release, she is being kept in solitary confinement.   The other Named Plaintiffs—Shakena Walston, Erriyah Banks, Destinee Tovar, Petroba Michieka, and James Thompson—are also impoverished individuals who were arrested this week for misdemeanor or felony offenses in Dallas County. They are all being kept in jail cells at the Dallas County Jail because they cannot afford to pay the money bail amount required for release.

2.      The Named Plaintiffs' money bail amounts are being required pursuant to Dallas County's schedules of secured monetary bail amounts and without any inquiry into their ability to

pay or any consideration of or findings concerning alternative conditions of release. Because they are impoverished and cannot afford the payment required by the County for their release, the Plaintiffs—who are presumptively innocent—will be detained in Dallas County jail cells for days or weeks, until they are finally brought to court on the "jail chain."

3.      In Dallas County, while wealthier arrestees are released from custody almost immediately upon payment of money to the County, arrestees like the Named Plaintiffs who are too poor to purchase their freedom remain in jail because of their poverty. Misdemeanor arrestees, like Ms. Daves and Ms. Tovar, who cannot afford to purchase their release must wait at least four to ten days before they are brought to court on the jail chain for a first appearance. Felony arrestees, like Ms. Walston, Ms. Banks, Mr. Michieko, and Mr. Thompson, must wait at least two to three weeks for this appearance if they waive indictment—and two to three *months* if they do not.

4.      First appearance is the first even theoretical opportunity for an arrestee to speak to a judge who can consider ability to pay or challenge conditions of release. However, in practice, even this "appearance" is not a true opportunity to raise ability to pay and challenge conditions of release, because arrestees are not brought into the courtroom unless they are pleading guilty. And, faced with the prospect of lengthy pretrial detention, the majority of detained misdemeanor and low-level felony arrestees do plead guilty at this first appearance. These guilty pleas typically in sentences of "time served" and release from Dallas County custody that same day.

5.      Although the Supreme Court has explained that pretrial detention must be the "carefully limited exception" in our legal system, *United States v. Salerno*, 481 U.S. 739, 755 (1987), as a result of these policies and practices, almost 70% of people in the Dallas County Jail— thousands every night—have not been convicted of a crime. Instead, they languish in jail cells because they cannot afford to pay the amount of money required for their release.

6.     This mass detention based on wealth has devastating consequences for Plaintiffs, for their families, and for the community. Pretrial detention of presumptively innocent human beings causes people to lose their jobs and shelter, interrupts vital medication cycles, and separates parents and children. It coerces guilty pleas and results in longer sentences. Even a few days of pretrial detention make people more likely to commit crimes in the future and cost Dallas County tens of millions of dollars every year.

7.     On behalf of the many other arrestees subjected to Dallas County's unlawful and ongoing post-arrest wealth-based detention scheme, Plaintiffs challenge Defendants' use of money bail to detain only the most impoverished arrestees. Dallas County's wealth-based pretrial detention system violates the Equal Protection and Due Process Clauses of the United States Constitution. It has no place in our society.

8.     By and through their attorneys and on behalf of themselves and all others similarly situated, Plaintiffs seek to enjoin Defendants' wealth-based post-arrest procedures, and a declaration that Defendants cannot employ a system of wealth-based detention by imposing and enforcing secured money bail without an inquiry into and findings concerning the arrestee's present ability to pay, and without individualized consideration of less-restrictive, alternative conditions of release.

## **Nature of the Action**

9.     It is the policy and practice of Defendants to refuse to release arrestees from custody unless they pay a monetary sum. The amount of money required is determined by an offense-based, secured money bail schedule, and it is the policy and practice of Dallas County officials to require the generic, predetermined amount without considering the person's ability to pay or alternatives to secured money bail, and without making the substantive findings or providing the

procedural safeguards that the Constitution requires to ensure that a person's resulting detention is necessary to further the government's interests.

10.     This policy and practice results in the systemic wealth-based detention of those arrestees who are too poor to pay money bail. Plaintiffs seek declaratory and injunctive relief prohibiting Defendants' wealth-based, post-arrest detention scheme.

## Jurisdiction and Venue

11.      This is a civil rights action arising under 42 U.S.C. § 1983 and 28 U.S.C. § 2201, *et seq*., and the First, Sixth, and Fourteenth Amendments to the United States Constitution. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

12.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391.

## Parties

13.     Named Plaintiff Shannon Daves is a 47-year-old woman. She was arrested on Wednesday, January 17, 2018, for an alleged misdemeanor offense.  She is currently experiencing homelessness and does not have a job. She cannot afford the $500 money bail amount required for her release, without an inquiry or findings concerning her ability to pay. Because she is transgender and is being held in the men's unit of the jail, Dallas County is keeping her in solitary confinement 24 hours a day.  She represents herself as an individual and a class of similarly situated people subjected to Defendants' wealth-based post-arrest detention scheme. *See* Exhibit 1, Declaration of Shannon Daves.

14.     Named Plaintiff Shakena Walston is a 29-year-old woman. She was arrested on Friday, January 19, 2018, for an alleged felony offense. She is indigent and currently unemployed, and avoids homelessness by staying with her sister. She cannot afford the $15,000 money bail amount required for her release without an inquiry or findings concerning her ability to pay. She

is trying to start a program at a local community college with the help of financial aid, but cannot pursue those plans while she is in custody. She represents herself as an individual and a class of similarly situated people subjected to Defendants' wealth-based post-arrest detention scheme. *See* Exhibit 2, Declaration of Shakena Walston.

15.     Named Plaintiff Erriyah Jones is a 26-year-old woman. She was arrested on Friday, January 19, 2018, for two alleged felony offenses. She is currently unemployed and lives with and takes care of her mother, who receives disability payments and food stamps. She cannot afford the $50,000 money bail amount required for her release without an inquiry or findings concerning her ability to pay. She has health issues requiring medication and a special diet, but is not being provided either at the Jail. She represents herself as an individual and a class of similarly situated people subjected to Defendants' wealth-based post-arrest detention scheme. *See* Exhibit 3, Declaration of Erriyah Jones.

16.     Named Plaintiff Destinee Tovar is a 19-year-old woman. She was arrested on Janaury 19, 2018, for an alleged misdemeanor offense. She is currently unemployed and without stable housing. She cannot afford the $1,500 money bail amount required for her release without an inquiry or findings concerning her ability to pay. She represents herself as an individual and a class of similarly situated people subjected to Defendants' wealth-based post-arrest detention scheme. *See* Exhibit 4, Declaration of Destinee Tovar.

17.     Named Plaintiff Patroba Michieka is a 30-year-old man. He was arrested on January 19, 2018, for an alleged state-jail-felony offense. He struggles to meet the basic necessities of life and lives with his mother to avoid homelessness. He cannot afford the $500 money bail amount required for his release without an inquiry or findings concerning his ability to pay. He was working a few days a week before his arrest, but fears he will lose that job because he is in custody.

He represents himself as an individual and a class of similarly situated people subjected to Defendants' wealth-based post-arrest detention scheme. *See* Exhibit 5, Declaration of Patroba Michieka.

18.     Named Plaintiff James Thompson is a 28-year-old man. He was arrested on Thursday, January 18, 2018, for two alleged state jail felonies. He is indigent and unemployed, and avoids homelessness by living with his parents. He cannot afford the $60,000 money bail amount that Dallas County requires for his release without an inquiry or findings concerning his ability to pay. He represents himself as an individual and a class of similarly situated people subjected to Defendants' wealth-based post-arrest detention scheme. *See* Exhibit 6, Declaration of James Thompson.

19.     Defendant Dallas County is a municipal corporation organized under the laws of the State of Texas.[1] The County, through the Commissioners Court, makes policy decisions about which arrestees are eligible for release on unsecured bond or non-financial conditions, and which arrestees, among those arrested by Dallas County law enforcement officers, may be released on a citation instead of being arrested. The County also makes policy decisions about whether and at what level to fund the County's jail, courts, and pretrial services agency. The County's policies result in systemic wealth-based pretrial detention of Dallas County arrestees.

20.     The Dallas County Sheriff is a County official, the head of the Dallas County Sheriff's Department, and the keeper of the County Jail.  The Dallas County Sheriff, Defendant

---

[1] The Dallas County Sheriff, Dallas County Commissioners Court, Dallas County Criminal Court at Law Judges, and Dallas County Criminal District Court Judges are all final policymakers for various aspects of Dallas County's post-arrest policies and practices. Each is named separately from the County as a Defendant in the event the Court concludes any of them are acting on behalf of the State or that the Judges are acting judicially with respect to any particular function. If the Court agrees that these Defendants are final policymakers for Dallas County, then Plaintiffs agree that naming them individually is redundant of a suit against the County.

Marian Brown, is the final policymaker for running and administering the jail in Dallas County. She is sued in her official capacity.

21.     Roberto Canas, Jr., Elizabeth Crowder, Lisa Green, Julia Hayes, Peggy Hoffman, Shequitta Kelly, Angela King, Nancy C. Mulder, Dan Patterson, Doug Skemp, and Tina Yoo Clinton are the Dallas County Criminal Court at Law Judges ("misdemeanor Judges"). Sitting *en banc* as an administrative body, the misdemeanor Judges promulgate the generally applicable bail misdemeanor schedule applied by the County systemically to determine the conditions of pretrial release for all misdemeanor arrestees. Exhibit 7. Each misdemeanor Judge is sued in her individual and official capacities for injunctive and declaratory relief.

22.     Jennifer Bennett, Brandon Birmingham, Robert Burns, Dominique Collins, Stephanie Fargo, Livia Liu Francis, Hector Garza, Amber Givens-Davis, Teresa Hawthorne, Tracy Holmes**,** Jeanine Howard, Tammy Kemp, Nancy Kennedy, Gracie Lewis, Stephanie Mitchell, Carter Thompson, and Ernest White are the Dallas County District Court Judges ("felony Judges"). Sitting *en banc* as an administrative body, the felony Judges promulgate the generally applicable felony bail schedule applied by the County systemically to determine the conditions of pretrial release for all felony arrestees. Exhibit 8. Each felony Judge is sued in her individual and official capacities for injunctive and declaratory relief.

23.     Steven Autry, Lisa Bronchetti, Janet Lusk, Terrie McVea, Anthony Randall, and Hal Turley are all Dallas County Magistrates. Each is a County employee who is appointed by a unanimous vote of Defendant Judges.[2] The Magistrates can be fired by a majority vote of the

---

[2] Tex. Code Ann. § 54.301(a) (authorizing the Judges of the District Courts and County Criminal Courts to "appoint a magistrate to perform the duties authorized by this subsection."); *id.* at §54.401(c) ("If a magistrate serves more than one court, the magistrate's appointment must be made with the unanimous approval of all the judges under whom the magistrate serves.").

Defendant Judges.[3] The Magistrates act only at the direction of the Judges, and have only whatever authority or discretion the Judges allow them to exercise.[4] The Magistrates are sued for declaratory relief only.

## Factual Background

### A. The Named Plaintiffs Are in Jail Because They Are Unable to Pay the Money Bail Demanded for Their Release

24.     At Dallas County Jail, each Plaintiff appeared before a Magistrate, in a room at the jail that is closed to the public, and the Magistrate informed them of the charges and the money bail amount required for release. Ex. 1 ¶ 5; Ex. 2 ¶ 4; Ex. 3 ¶ 3; Ex. 4 ¶ 3; Ex. 5 ¶ 6; Ex. 6 ¶¶ 5–7. They were told by Dallas County Sheriff's Deputies not to speak at the hearing. Ex. 1 ¶ 4; Ex. 3 ¶ 3; Ex. 4 ¶ 5; Ex. 5 ¶ 5. The hearings each lasted less than 60 seconds and, pursuant to the policies and practices described in this Complaint, no inquiry was made into any Plaintiff's ability to pay, nor was there any consideration of alternative, non-financial conditions of release. Ex. 1 ¶ 5; Ex. 2 ¶ 5; Ex. 3 ¶ 4; Ex. 4 ¶ 4; Ex. 5 ¶ 7; Ex. 6 ¶ 8.

25.     Plaintiff Shannon Daves is a 47-year-old woman. Ex. 1 ¶ 1. Ms. Daves is currently unemployed and experiencing homelessness. *Id.* ¶ 10–11. She struggles to meet the basic necessities of life. *Id.* ¶ 11.

26.     Ms. Daves was arrested on Wednesday, January 17, and taken into Dallas County custody for an alleged misdemeanor offense. *Id.* ¶ 2. She was informed that, because of the Dallas County bail schedule, she would be released immediately, but only if she paid a money bail amount

---

[3] Tex. Code Ann. § 54.305(b) ("The services of a magistrate who serves more than one court may be terminated by a majority vote of all the judges whom the magistrate serves.").

[4] *Davis v. State*, 956 S.W.2d 555 (Tex. Crim. App. 1997) ("However, a magistrate is not a judge in his own right and acts as a surrogate of the duly elected judge. . . ."); *Gambling Paraphernalia, Devices, Equipment, & Proceeds v. State*, 22 S.W.3d 625, 627 (Tex. App.—Dall. 2000, no pet.) ("[The Magistrate] acts as an agent of the district courts and has no authority of his own.").

of $500—an amount predetermined by the Dallas County bail schedule. *See id.* ¶ 5. She was told that she would be detained by Dallas County if she does not pay. *See id.* ¶¶ 2–5.

27.     Because she cannot afford to purchase her freedom, and because of the jail's policies relating to people who are transgender, Ms. Daves is being kept in solitary confinement 24 hours a day, segregated from the rest of the jail population. *Id.* ¶¶ 7–8. She has not been permitted to exercise, and she eats alone in her cell. *Id.* ¶ 8.

28.     Plaintiff Shakena Walston is a 29-year-old woman. Ex. 2 ¶ 1. Ms. Walston is currently unemployed and living with her sister to avoid homelessness. *Id.* ¶¶ 6–7. She struggles to meet the basic necessities of life. *Id.* ¶ 6.

29.     Ms. Walston was arrested on Friday, January 19, and taken into Dallas County custody for an alleged felony offense. *Id.* ¶¶ 2–3. She was informed that, because of the Dallas County bail schedule, she would be released immediately, but only if she paid a money bail amount of $15,000—an amount predetermined by the Dallas County bail schedule. *See id.* ¶ 4. She was told that she would be detained by Dallas County if she does not pay. *See id.* ¶¶ 4–5, 10. Because she cannot afford to purchase her freedom, she remains in the Dallas County Jail. *Id.* ¶ 10. She was trying to start a program at a local community college with the help of financial aid, but cannot pursue those plans until she is released. *Id.* ¶ 9.

30.     Plaintiff Erriyah Banks is a 29-year-old woman. Ex. 3 ¶ 1. Ms. Banks is currently unemployed and living with her mother to avoid homelessness. *Id.* ¶¶ 6–7. Her mother relies on her as her caretaker. *Id.* ¶ 10. Ms. Banks struggles to meet the basic necessities of life. *Id.* ¶ 6.

31.     Ms. Banks was arrested on Friday, January 19, and taken into Dallas County custody for an alleged state jail felony and felony offense. *Id.* ¶ 2. She was informed that, because of the Dallas County bail schedule, she would be released immediately, but only if she paid a

money bail amount of $50,000—an amount predetermined by the Dallas County bail schedule. *See id.* ¶ 3. She was told that she would be detained by Dallas County if she does not pay. *See id.* ¶¶ 3–7. Because she cannot afford to purchase her freedom, she remains in the Dallas County Jail. *Id.* ¶ 7. She has not been given the medication or special diet that she needs to treat ongoing health issues, and her mother remains without a caretaker. *Id.* ¶¶ 8, 10.

32.     Plaintiff Destinee Tovar is a 19-year-old woman. Ex. 4 ¶ 1. Ms. Tovar is currently unemployed and without stable housing. *Id.* ¶ 6. She struggles to meet the basic necessities of life. *Id.*

33.     Ms. Tovar was arrested on Friday, January 19, by the Mesquite Police Department for an alleged misdemeanor and taken to Mesquite's jail. *Id.* ¶ 2. She was informed by a judge there that she would be released immediately, but only if she paid a bond amount of $500. *Id.* ¶ 2. She could not afford to pay, so she remained in custody until she was transferred to the Dallas County Jail. *Id.* ¶ 3. At the Dallas County Jail, she saw a Magistrate Judge, who informed her that she would be released immediately, but only if she paid a bond amount of $1,500—an amount predetermined by the Dallas County bail schedule. *Id.* She was told that she would be detained by Dallas County if she does not pay. *See id.* Because she cannot afford to purchase her freedom, she remains in the Dallas County Jail. *Id.* ¶¶ 3, 7.

34.     Plaintiff Patroba Michieka is a 30-year-old man. Ex. 5 ¶ 1. Before his arrest, Mr. Michieka was working a few days a week and was living with his mother to avoid homelessness. *Id.* ¶¶ 9–10. He struggles to meet the basic necessities of life. *Id.* ¶ 8.

35.     Mr. Michieka was arrested on Friday, January 19, for an alleged state-jail felony offense. *Id.* ¶ 2. He was informed that, because of the Dallas County bail schedule, he would be released immediately, but only if he paid a money bail amount of $500—an amount predetermined

by the Dallas County bail schedule. *See id.* ¶ 6–7, 11. He was told that he would be detained by Dallas County if he did not pay. *See id.* ¶¶ 6–7, 11. Because he cannot afford to purchase his freedom, he remains in the Dallas County Jail. *Id.* ¶ 11. He fears he may lose his job because he is unable to go to work. *Id.* ¶ 10.

36.     Plaintiff James Thompson is a 38-year-old man. Ex. 6 ¶ 1. He is currently unemployed and living with his parents to avoid homelessness. *Id.* ¶ 10. He struggles to meet the basic necessities of life. *Id.*

37.     Mr. Thompson was arrested on Thursday, January 18, by the Garland Police Department for two alleged state-jail felony offenses and taken to Garland's jail. *Id.* ¶ 2. He was informed by a judge there that he would be released immediately, but only if he paid a bond amount of $90,000. *Id.* ¶ 2. He could not afford to pay, so he remained in custody until he was transferred to the Dallas County Jail. *Id.* ¶ 3–4. At the Dallas County Jail, he saw a Magistrate Judge, who informed him that he would be eligible for release from Dallas County custody, but only if he paid a bond amount of $60,000—an amount predetermined by the Dallas County bail schedule. *Id.* ¶ 7. He was told that he would be detained by Dallas County if he does not pay. *See id.* Because he cannot afford to purchase his freedom, he remains in the Dallas County Jail. *Id.* ¶¶ 9, 12.

### B.     Defendants' Wealth-Based Detention System Detains Arrestees Who Cannot Pay Secured Money Bail Amount While Releasing Those Who Can Pay

38.     As a matter of policy and practice, Dallas County requires all arrestees to pay secured money bail to be released from jail. The bail amounts are not individualized; they are set according to a "bail schedule"—a list of monetary amounts that correspond to the offense charged. Dallas County uses a bail schedule to determine conditions of release, even though Texas law

allows Dallas County to permit release on nonfinancial conditions or unsecured bail, and to issue citations for various misdemeanor offenses, instead of making arrests.[5]

39.     "Bail" means "conditions of release." The phrase "money bail" or "secured money bail" means that the person's release is conditioned on the pre-payment of a monetary amount, i.e. the person must pay some amount of money upfront in order to be released. The phrase "unsecured bail" or "unsecured bond" means that the person's release is conditioned on a promise to make a monetary payment if the person does not appear for court; the person is not required to make a monetary payment upfront in exchange for release.[6]

40.     Arestees who cannot afford the predetermined money bail amount are detained pursuant to the bail schedule—without even a theoretical opportunity to raise ability to pay and challenge the generic, secured financial condition required automatically by Dallas County—until their first appearance in court. As a matter of policy and practice, impoverished misdemeanor arrestees are detained pursuant to the bail schedule for four to ten days before they are brought to court. Felony arrestees who waive indictment are detained pursuant to the bail schedule for two to three weeks. Felony arrestees who do not waive indictment are detained pursuant to the bail schedule for two to three months.

---

[5] Texas law gives Dallas County the authority to cite and release a person accused of certain misdemeanor offenses. Tex. C.C.P. Art. 14.06(b)–(d). However, Dallas County has rejected the cite-and-release option as a matter of policy for all eligible offenses except possession of less than four ounces of marijuana. *See* Kevin Cokely, *Dallas 'Cite and Release' Policy Goes Into Effect Friday For Small Amounts of Marijuana*, Dall. Morning News, Nov. 28, 2017, available at https://www.nbcdfw.com/news/local/Dallas-Hosts-Forum-in-Preparations-for-Cite-and-Release-Program-460489773.html.

[6] *See* Tim Schnacke, United States Department of Justice, National Institute of Corrections, *Fundamentals of Bail: A Resources Guide for Pretrial Practitioners and a Framework for American Pretrial Reform* 112–13 (2014), available at http://www.clebp.org/images/2014-11-05_final_bail_fundamentals_september_8,_2014.pdf   ("[B]ail is best defined in terms of release, and most appropriately as a process of conditional release. . . . The purpose of bail, rather, is to effectuate and maximize release. There is 'bail'—i.e., a process of release—and there is 'no bail[]'—a process of detention.").

41.     In practice, this first court appearance is not a true opportunity to raise ability to pay or challenge conditions of release, because arrestees are brought into the courtroom to speak to the Judge only if they are pleading guilty, and most misdemeanor and low-level-felony arrestees do plead guilty, typically accepting sentences of time served.

42.     As a result of Defendants' policies and practices, impoverished arrestees are kept in jail for days or weeks solely because they cannot afford to make a monetary payment, while arrestees with access to money are released.

### 1.     Arrest and transport to the Dallas County Jail

43.     The Dallas County Sheriff's Department, the City of Dallas Police Department, and numerous other agencies within Dallas County have the authority to arrest people for misdemeanor and felony offenses. Dallas County and the City of Dallas are responsible for the vast majority of the arrests in Dallas County.

44.     The post-arrest process is substantially the same for all arrestees, regardless of which agency makes the arrest, and regardless of whether the person is arrested pursuant to a warrant or a warrantless arrest.[7]

45.     When a person is arrested by an agency other than Dallas County or the City of Dallas, she will be taken first to the local lockup run by that agency.

---

[7] However, people who are arrested by agencies other than Dallas County or the City of Dallas are typically subjected to longer periods of wealth-based detention than those arrested by Dallas County or the City of Dallas, because they are kept initially in the local lockup of the arresting authority before they are transferred to the Dallas County Jail. Often, several days pass prior to transfer from one of these outlying jails. For example, Dallas County transports arrestees from Richardson City Jail every one to three days. Some municipal jails transport arrestees only once or twice per week. Arrestees who are detained initially at these other jail facilities learn the money bail amount required for release soon after they are taken to the local lockup.

46.     In about half of the jurisdictions that make arrests within Dallas County, a local magistrate informs the arrestee of her bail amount in person at the local jail.[8]  Some of these magistrates apply the Dallas County bail schedules, and some apply their own local policies for setting bail.

47.     In the other jurisdictions, arrestees appear by videolink before the Defendant Dallas County Magistrates. In these jurisdictions, Dallas County Magistrates refer to the Dallas County misdemeanor and felony bail schedules to determine the amount of secured money bail required for release.

48.     Dallas County transports arrestees from the local lock-ups run by agencies other than Dallas County and the City of Dallas.

49.     It can take two or three days for a person arrested by an agency other than Dallas County or the City of Dallas to be transported to the Dallas County Jail. Arrestees who are kept at these local jails have no access to appointed counsel during this entire period of time, but they can leave the local jail at any time if they pay the money bail amount.

50.     People arrested by Dallas County or the City of Dallas are taken directly to the Dallas County Jail, known locally as "Lew Sterrett."

51.     On average, Dallas County books 182 new arrestees into the Dallas County Jail, every day.

52.     The Defendant Sheriff detains arrestees at the Dallas County Jail, which houses all inmates to be held pending trial in the Dallas County courts.

---

[8] At some of the municipal jails, local Magistrates visit the jail once per day to inform newly arrested individuals of the money bail amounts required for their release. At others, the local Magistrates visit the municipal jail several times a day for this purpose. As a result, the amount of time after arrest and before a person who has been transported to a municipal jail learns the money bail amount required for release varies from municipal jail to municipal jail.

53.     Regardless of the arresting agency, once an arrestee arrives at the Dallas County Jail, a Magistrate determines probable cause for warrantless arrests on the basis of documents filed by the arresting officer.

54.     If the Magistrate concludes that probable cause existed for a warrantless arrest, or if the arrest was pursuant to a warrant, the booking process will begin.

### 2.     Arraignment

55.     Arrestees are informed during the booking process of the money bail amount required for release during a proceeding that is closed to the public, and is referred to locally as "arraignment."

56.     During the booking process at the jail, and typically within a few hours of arriving there, Sheriff's deputies take groups of arrestees to appear for "arraignment" in person, in the jail, before a Magistrate.[9] Sheriff's Department employees and agents supervise, monitor, and give instructions to the arrestees before, during, and after "arraignment."

57.     Although the proceedings are called "arraignments," the purposes of arraignments as set forth in Texas law—to "fix[]" the arrestee's identity and "hear[] his plea," Tex. Code Crim. Proc. art. 26.02—are not fulfilled by these proceedings.

58.     Instead, at so-called "arraignments," Magistrates inform the arrestees of certain rights, as required by Article 15.17 of the Texas Code of Criminal Procedure, as well as the offense charged and the monetary payment required for release pending trial.[10] The allegations giving rise to the charges are not read aloud at arraignment, and no plea is entered.

---

[9] Arrestees who appeared before a magistrate while being kept at an outlying jail will also appear before a Dallas County Magistrate during the booking process at the Dallas County Jail.

[10] Most warrants do not have a money bail amount written on them. However, warrants for probation violations or bond forfeitures typically do have bond amounts on them. Arrestees who are aware of the existence of a warrant and have access to money can post a bond without ever being fully booked into the jail. Those who know about active warrants for their arrest can avoid even being arrested if they pay for a "non-arrest" bond.

59.     If a person is too sick to be kept with the general population, or if the person does not speak English and needs an interpreter to understand the proceedings, the person's appearance before a Magistrate at the Dallas County Jail will be delayed, sometimes several days, until the person's health stabilizes, or a translator can be located.

60.     The number of people who appear before Magistrates for arraignment at one time varies. Dockets can regularly be as small as two or three people, or as large as 15 to 20 arrestees, and sometimes more.

61.     There are no defense attorneys or prosecutors at these hearings.

62.     The Sheriff's Office has closed the hearings to the public and refused a request by undersigned counsel to observe the hearings. A deputy at the jail recently refused another request to observe the hearings, stating that the proceedings are "for inmates and no one else."

63.     Most hearings are not recorded on audio or video, despite a Texas statute requiring that the hearings be recorded.[11] *See* Tex. C.C.P. 15.17(a), (e).

64.     Arraignments occur at intervals every day of the week around the clock.

65.     Before an arraignment docket begins, Sheriff's deputies order arrestees not to speak and not to ask questions unless the Magistrate gives them permission.

66.     Some deputies also tell arrestees that the Magistrate will increase the money bail amount required for their release if the arrestees say anything during the hearing.

---

[11] Other arraignments which take place by videolink from outlying jails are recorded. Additionally, when a person is already in jail and charges are enhanced or reduced, or new charges are levied, a Defendant Magistrate will conduct an arraignment by videolink. These hearings are also recorded. Videos of these recorded hearings can be viewed in the discretion of the Chief Magistrate Judge, Terrie McVea. An attorney with the ACLU of Texas was permitted to watch a few magistration dockets in the jail before the Sheriff made the decision to close the hearings to the public. Allegations about what happens during the hearing are based on undersigned counsel's review in Judge McVea's office of about 20 video recordings and the recollections of the attorney who was permitted to watch the dockets in person before they were closed to the public.

67.     When the hearings begin, the Magistrate first informs the group of arrestees of certain rights, for example, to remain silent, and to appointed counsel if they cannot afford an attorney, as required by Article 15.17 of the Texas Code of Criminal Procedure.

68.     Then, the Magistrate begins calling individual names and informs the arrestee of the charge or charges against her (but not the allegations underlying the charge or charges), and the amount of money she must pay to be released.

69.     The process of setting bail is a rote exercise. The Magistrate simply recites the secured money bail amount required by the County's bail schedule.

### 3.     The bail schedules

70.     During each "arraignment," a Magistrate sets money bail amounts according to the predetermined money bail schedules promulgated by the Defendant Judges.

71.     The misdemeanor Judges, voting *en banc* as an administrative body, promulgated a schedule that applies to misdemeanor arrestees, *see* Exhibit 7 (bail schedule for misdemeanor arrestees).

72.     The felony Judges, voting *en banc* as an administrative body, promulgated a schedule that applies to felony arrestees, *see* Exhibit 8 (bail schedule for felony arrestees).

73.     The bail schedules are the exclusive means for determining conditions of pretrial release for arrestees who are taken to the Dallas County Jail.

74.     The bail schedules require Magistrates to impose secured money bail in every case.

75.     The misdemeanor bail schedule states explicitly that "[a]ll bonds are cash or surety unless otherwise specified by the Judge."

76.     The misdemeanor Judges permit Magistrates to adjust the specific amount of secured money bail required, in light of only the following factors: "the nature of the offense, the

safety of the complaining witness and the community, as well as ensuring the appearance of the Defendant at court settings."[12] *Id.*

77.     The misdemeanor Judges have not authorized Magistrates to consider ability to pay or alternative methods of reasonably assuring appearance in court.

78.     Upon information and belief, the misdemeanor Judges recently authorized—but did not require—Magistrates to grant release on unsecured bond if a misdemeanor arrestee is charged with a non-violent offense and has no or minimal criminal history.

79.     However, the Magistrates are not exercising this limited authority to consider non-financial conditions. The Magistrates continue their well-settled, widespread practice of requiring secured money financial conditions in every case consistent with the formally promulgated policy. The Magistrates do not inquire about ability to pay in any case.

80.     The felony bail schedule is similar to the misdemeanor bail schedule.

81.     As a matter of policy and practice, the Magistrates interpret the felony Judges' bail schedule to require secured money bail in every case, and the felony Judges acquiesce in that interpretation.

82.     The felony Judges permit Magistrates to deviate from the bail amounts "if justified by the facts of the case and the circumstances of the defendant." Exhibit 8.

83.     Whatever authority the felony judges have granted magistrates to deviate from the bail schedule, Magistrates do not use it: Magistrates have a well-settled, widespread practice of requiring secured money bail pursuant to the bail schedule.

84.     Magistrates do not consider an arrestee's ability to pay when determining conditions of release in misdemeanor or felony cases.

---

[12] A previous version of the bail schedule prohibited Magistrates from reducing the money bail amount in any case.

85.     Indeed, Magistrates *cannot* consider ability to pay—in misdemeanor or felony cases—because they have no financial information about the arrestees who appear before them, and they make no inquiry into arrestees' ability to pay any particular money bail amount.

86.     Moreover, arrestees are told that they may not speak until after everyone's hearing is concluded and the Magsitrate has informed each arrestee of the charge or charges against them and the money bail amounts required for release.

87.     Nor do the Magistrates—or any other government official—consider alternatives to secured financial conditions of release, or make findings that a secured financial condition of release is necessary to meet any governmental interest.

88.     In addition to making no affirmative inquiry into or findings concerning ability to pay, Magistrates affirmatively refuse to hear any argument from an arrestee who is bold enough to raise her inability to pay. If an arrestee does ask for a lower money bail amount or for release on non-financial conditions, as a matter of policy and practice, the Magistrate refuses to change the money bail amount required by the Judges' schedule and tells the person to speak with her lawyer. Of course, indigent arrestees do not yet have a lawyer.

89.     Magistrates refuse to reduce money bail amounts or grant release on unsecured bail or non-financial conditions, even when the Magistrate knows or should know that the person will be detained as a result of a secured financial condition of release.

90.     Magistrates do not make any findings, on the record or otherwise, about the appropriateness of the conditions of release they require or alternative conditions of release in light of any government interest.

91.     Magistrates also do not make any findings concerning the arrestee's ability to pay money bail, or the reasons for the specific amount of money bail required for release.

92.     Each person's entire judicial hearing for determining the conditions of release (or resulting in de facto money-based orders of pretrial detention) lasts about one minute or less.

### 4.      After the arraignment docket

93.     After arraignment, the officers and employees of the Sheriff's Department are authorized by County policy to accept money bail as predetermined by the schedule and to release arrestees who pay money bail in accordance with the bail schedule.

94.     After each arraignment docket concludes, Sheriff's deputies ask arrestees whether they can afford the secured money bail required for their release.

95.     Arrestees who were booked into the Dallas County Jail with sufficient cash on hand to pay the money bail amount will be taken to the "vault"[13] in the jail to get the money necessary for their release.

96.     Other arrestees who can afford the money bail amount, but do not have cash on hand, will be escorted to an ATM machine located in the booking area of the jail. Using this ATM, arrestees with sufficient funds in personal bank accounts can access their bank accounts, withdraw money, and purchase their release.

97.     Arrestees who cannot afford the full amount of money bail on their own can make a phone call to ask a friend or family member to pay the monetary amount on their behalf, or they can contact a for-profit bonding company to assist in making the payment.

98.     Arrestees who tell the Sheriff's deputies that they cannot afford to make the monetary payment will be assigned to a housing unit and confined to a jail cell after arraignment. Arrestees are housed together with convicted prisoners, under the exact same conditions.

### 5.      The moment of differential treatment

---

[13] When someone is arrested, their personal clothing and belongings are inventoried and stored in a vault.

99.     From the moment an arrestee who is otherwise eligible for release (i.e., who is not subject to an immigration detainer, parole hold, or out-of-county warrant) learns the amount of money required for her release, a person with access to money can make the monetary payment required for release and be released within a few hours. This is the moment of differential treatment.

100.    Secured money bail prolongs the detention of even those individuals who would be detained for other reasons, for example, those who are subject to probation holds or out-of-county warrants. Although these individuals would not be released from detention entirely if they paid the money bail amount, they would be released from Dallas County custody and eligible for transport to the other jurisdiction that requires their presence, or they could potentially secure release in the other jurisdiction. A secured financial condition of release thus prolongs the detention of a person who faces other proceedings if she is too poor to pay the money bail amount required by the Dallas County bail schedule.

101.    For arrestees who cannot afford money bail, the secured financial condition of release operates as a de facto order of pretrial detention, even though Defendants do not provide the findings or procedures that the Constitution requires prior to the entry of an order of pretrial detention. None of the robust procedures required for a valid order of preventative detention exist in Dallas County, including that there is no inquiry, let alone an inquiry with counsel and basic evidentiary standards, into whether a compelling interest exists to detain a particular defendant, whether any particular identifiable danger or risk exists, and whether there are alternatives to the use of secured money bail that could mitigate any particularized risk.

102.    No transparent legal standards are applied to the decision that results in the de facto pretrial detention orders.

103.    The Magistrates' custom of requiring secured money bail as a condition of release in every case, the Judges' acquiescence in this custom, and the Sheriff's policy of enforcing unconstitutional orders conditioning release on a monetary payment causes systemic and automatic wealth-based detention in Dallas County.

### 6.    Delays in appointing counsel for indigent arrestees

104.    Dallas County routinely jails arrestees who cannot afford to pay money bail for two or three days before appointing a lawyer to represent them.

105.    However, arrestees typically wait another several days after appointment, and sometimes a week or two, for meaningful representation to begin. The delay is caused in part by Dallas County's refusal, as a matter of policy, to computerize or automate the process for appointing counsel. The entire appointment process is done on paper and, as a result, takes several days.

106.    Public defenders' crushing caseloads cause further delays in the beginning of meaningful representation for indigent arrestees.

107.    Sheriff's deputies distribute election-of-counsel forms after the arraignment dockets. Arrestees who wish to be appointed an attorney must provide financial information on the form. The Judges and their court coordinators[14] use the financial information to determine each arrestee's eligibility for appointed counsel.

---

[14] Each Judge employs a "court coordinator," who is responsible for managing the Judge's docket, including appointing attorneys to impoverished arrestees in accordance with that judge's individual policies and the County-wide policies.

108.    Sheriff's Department employees sort the forms into the Judges' mailboxes. (When a person is arrested for a misdemeanor, the case is randomly assigned to a specific Judge.[15] New felony arresetes are randomly assigned to a specific Judge at arraignment.)

109.    Court coordinators collect the forms once each day from the mailbox of the Judge for whom they work.

110.    The court coordinators review the forms to determine which arrestees assigned to the Judge requested appointed counsel and, applying both countywide and Judge-specific criteria, whether those arrestees qualify.

111.    Because court coordinators do not work on evenings, weekends, or holidays, and only retrieve the forms once each day, an individual who is arrested on a Thursday or Friday will not be appointed an attorney until Monday or Tuesday at the earliest.

112.    As a matter of policy and practice, if an arrestee is in jail because she has not paid a monetary bail amount, Judges and their court coordinators presume that the individual is indigent and assign the individual appointed counsel.

113.    Once court coordinators determine that an arrestee is entitled to appointed counsel, the court coordinators assign an attorney to the case and notify the attorney of the appointment.

114.    All appointed attorneys are required to contact new clients within 24 hours of appointment either by visiting in person, by videolink, or by sending a letter.

115.    However, there is no oversight or enforcement of this rule, and many defense attorneys do not comply with it.

116.    As a result, even once an attorney is appointed, representation is further delayed.

---

[15] All misdemeanor family violence cases are assigned to County Courts at Law Numbers 10 and 11.

117.    Arrestees lack any ability to contact an attorney who has been appointed to represent them because Judges have directed court coordinators to refrain from informing arrestees when an attorney has been appointed. Arrestees must wait until the attorney affirmatively contacts and meets with them, at the attorney's initiative.

118.    Even if an arrestee being kept in the Dallas County Jail somehow did know the name and contact information of her assigned attorney, contacting the attorney would be slow, expensive, or impossible: the arrestee's options for contacting an attorney are to send a letter, which would take days to reach the attorney, or pay to use a phone to call the attorney. There is no way to make a no-cost call to a lawyer from the jail, where the phone system has been contracted to a private, multi-billion dollar corporation called Securus.

119.    As a result of these policies and practices, arrestees who are in jail because they cannot afford to pay money bail routinely wait two or three days days, and sometimes a week, before being appointed an attorney.

120.    Most wait even longer before meeting their attorneys: Impoverished arrestees who cannot pay money bail typically meet their lawyers when they are brought to court for a first appearance, which will occur only after the District Attorney's Office decides to file the charge.

### 7.  Delay in the DA's decision to file charges

121.    The misdemeanor judges allow the District Attorney's ("DA") Office four business days (or almost a week) to decide whether to file a misdemeanor case.

122.    The felony judges allow the DA's Office five business days (or one calendar week) to decide whether to file most felony cases, and ten business days (or two calendar weeks) to file thirty-six more serious felony cases, and thirty days to file three of the most serious felonies.

123.    The DA's Office can request additional time to file any charge.

124.     If charges are not filed within the relevant period of time, the arrestee must be released from jail, though the DA's Office retains the option to pursue the case.

125.     The time period within which charges must be filed or the arrestee released begins on the "date aware," which the Judges have defined as "the date the Dallas County Sheriff's Office enters the arrested person's information" into its database.

126.     If the arrested person's information is entered after 8:00 a.m., Dallas County considers the information to have been entered the next day. *Id.*

127.     As a result of the Judges' policies, indigent arrestees who cannot afford money bail are routinely kept in jail cells for eight days (if charged with a misdemeanor) and more than two weeks (if charged with a felony) before an ADA even files a charge.

128.     This time period will be longer if there is an intervening holiday.

129.     The total time period that a person is detained before charges are filed will also be longer if the person was arrested by an agency other than the City of Dallas or Dallas County. These arrestees are kept for several days at outlying jails before being transferred to the Dallas County Jail, but the "date aware"—which triggers the five- or ten-business-day clock for filing charges—occurs only after the person arrives at the Dallas County Jail.

130.     If the DA's Office does not file charges within the permitted time periods, impoverished arrestees who have been kept in jail since their arrest due to their inability to pay money bail will be released on their own recognizance after days or weeks of wealth-based detention.[16]

---

[16] Some impoverished arrestees, after being subjected to days or weeks of wealth-based detention but before the ADA makes a charging decision, manage to scrape together enough money from family and friends to pay a for-profit bonding company a non-refundable fee of hundreds, or thousands, of dollars to secure release from jail. Even if the ADA decides not to pursue the case, that person will never get her money back.

131.    In felony cases, after the DA's Office files charges, arrestees are entitled to indictment by a grand jury. Because of backlogs at the grand jury, it can take two to three *months* for the indictment process to conclude.

132.    The DA's Office must first file charges and (if the case is a felony case) a grand jury must issue an indictment before an arrestee will be brought to court for a first appearance.

133.    Due to the grand jury backlogs, felony arrestees—especially those charged with low-level felony offenses—routinely waive indictment so that they can be brought to court as soon as the ADA files charges.

### 8.    Arrestees cannot challenge conditions of release before charges are filed

134.    In theory, once a defense attorney is appointed and meets her client after approximately four days to one week of detention, the attorney could file a motion seeking alternative conditions of release for an arrestee who cannot afford the money bail amount required by the bail schedule.

135.    In practice, however, some judges refuse to entertain these motions before the DA files formal charges. Some Judges even claim that they lack jurisdiction to consider bond-reduction motions before a case is formally filed.

136.    Even when a defense attorney files a bond-reduction motion, Judges typically schedule the hearing for days or a week in the future.

137.    During this period of time, an arrestee who cannot afford to pay money bail will be kept in jail.

138.    The Presiding Judge of the misdemeanor courts referred to the four-to-ten-day period before a misdemeanor case is filed as a "black hole": during this time, nothing can happen in the case, and impoverished arrestees are left to languish in jail cells.

### 9.     First appearance

139.     Even after a case is filed, an arrestee may wait even longer to be taken to court. As of January 21, 2018, there were at least two individuals, arrested on January 9, 2018—one for possession of less than two ounces of marijuana and the other for trespass—who were being kept in the Dallas County Jail due to their inability to pay a $500 money bail amount. The cases were filed on January 16 and January 17, respectively, but neither has been assigned an attorney, and neither has been taken to court.

140.     First appearance is not an adequate opportunity to raise ability to pay or challenge conditions of release. Instead, the Judges' policies concerning first appearance ensure that a guilty plea is the fastest way for an impoverished arrestee to secure freedom. The Judges leverage Dallas County's money-based post-arrest system to minimize the backlog of cases on their dockets so that they can process as many cases as possible per week, and prosecutors use it to increase conviction rates.

141.     One of the purposes and effects of Dallas County's post-arrest money-based detention scheme is to coerce and process large numbers of guilty pleas prior to any person conducting any legal or factual investigation into the charges, let alone the complete and zealous investigation and defense required by professional standards and the Sixth Amendment to the United States Constitution.

142.     The system begins with court coordinators, to whom the Judges give responsiblity for scheduling arrestees' first appearances.

143.     As a matter of County policy, court coordinators do not schedule first appearances until the DA's Office files charges and (if applicable and not waived) an indictment has issued.

144.     As a result of Dallas County's policies to allow the DA's Office four business days to file charges in misdemeanor cases, and five or ten business days within to file most felony charges, first appearances for misdemeanor arrestees occur between four and ten days after arrest; first appearances for felony arrestees who waive indictment occur between two and three weeks after arrest; and first appearances for felony arrestees who do not waive indictment occur between two and three months after arrest.

145.     On the day of an arrestee's first appearance, officers and employees of the Sheriff's Department will transport the arrestee from the jail to the "lock-up"—which is a holding cell that is connected to, but outside of, the courtroom—on the so-called "jail chain."

146.     "Jail chain" is the term used to refer to the group of impoverished detained arrestees who are brought to court, shackled with metal chains, for their first appearance.

147.     In theory, first appearance is the first opportunity an arrestee who cannot afford to purchase her release has to speak or make any challenges to the conditions of release required by the Magistrate at "arraignment."

148.     But, as a matter of policy and practice, there is no meaningful review of the money bail amount previously imposed pursuant to the schedule. Instead, judges refuse to permit arrestees to enter the courtroom from lockup unless they have agreed to plead guilty.

149.     If an arrestee agrees to plead guilty at first appearance, she will be brought into the courtroom to enter a guilty plea.

150.     Most misdemeanor and low-level felony arrestees who are detained at first appearance plead guilty.

151.     In fact, some court coordinators delay bringing detained arrestees to court until they believe, based on past experience, that the individual is likely to plead guilty.

152.    Most misdemeanor and low-level felony arrestees who plead guilty at first appearance accept a sentence of time served and are then released from jail that day.[17]

153.    Others who plead guilty at first appearance but are not released that day accept sentences that nonetheless result in their release well before any subsequent court appearance would occur. The defense attorney is responsible for scheduling subsequent court appearances.

154.    Although requesting a bail reduction or seeking release on a personal bond is a theoretical possibility at the first appearance, it almost never happens. When it does, a hearing on the motion is typically set for about a week in the future as a matter of policy. Defense attorneys must ask the judge to break with custom to hear any matters at first appearance related to arrestees who are not pleading guilty.

155.    Even when Judges finally rule on bail reduction applications, they refuse to consider ability to pay, basing the decision instead on other factors, such as the person's criminal history or current charge. Judges very rarely grant bond reductions or permit release without requiring secured money bail.

156.    Due to these policies and practices, for people who cannot afford money bail, a guilty plea at first appearance is typically the fastest way out of jail.

157.    If an arrestee does not plead guilty at the first appearance, she will be taken back to Dallas County Jail, where she will be kept in a jail cell until her attorney decides to schedule another court appearance.

---

[17] The policies and practices in Dallas County are similar to the system that was enjoined in Harris County, where 67% of detained misdemeanor arrestees who pled guilty at their first appearance were released within a day of conviction, and 83% who pled guilty at first appearance were released within five days of conviction. *ODonnell v. Harris County*, 251 F. Supp. 3d 1052, 1114 (S.D. Tex. Apr. 28, 2017).

158.     It can take weeks or months for a subsequent appearance. As opposed to the federal system, which imposes strict time limits on pretrial detention through the Speedy Trial Act, Texas has mandated no strict time limits on pretrial detention.

### 10.     Summary of the post-arrest process

159.     The above-described policies and practices mean that a typical individual without financial means will be detained solely because of her inability to make a monetary payment for at least one week if charged with a misdemeanor, at least two weeks if charged with a felony and the arrestee decides to waive indictment, and for two or three months if charged with a felony and the arrestee does not waive indictment, before there is even a theoretical opportunity to challenge conditions of release.

160.     Many arrestees will be kept in jail even longer solely because they cannot pay money bail and are not willing to plead guilty.

161.     At any moment in the post-arrest process, an arrestee who is otherwise eligible for release can pay the money bail required by the County's bail schedule and walk out of the doors of the jail.

162.     Defendants' foregoing policies have consistently, for years, resulted in the needless and devastating jailing of impoverished arrestees in Dallas County.

163.     In 2017, about 50% of misdemeanor cases and about 50% of felony cases were resolved while the arrestee was in a jail cell because she could not afford secured money bail.

**C.   Arrestees who cannot afford to pay secured money bail will be detained in the Dallas County Jail for days or weeks due to their inability to pay**

164.    In Dallas County, there are four types of bonds an arrestee can post to secure release from jail after arrest and before disposition: cash bonds, surety bonds, pretrial-release bonds, and personal bonds (also referred to as "personal recognizance bonds").

165.    Each of these mechanisms of release requires either an upfront monetary payment, or significant time in jail.

166.    A person will be released on a "cash bond" if she pays the full money bail amount required for release. Arrestees who can afford to pay a cash bond typically do so quickly after arrest and are generally released the same day as their arrest, usually within hours of being arrested.

167.    A "surety bond" involves a contract between an arrestee and a for-profit bail bond company. Arrestees securing release from jail using a surety bond typically pay the company a nonrefundable fee equal to 10% of the total money bail amount required for release.

168.    In 2016 (as in September 2017), Dallas County arrestees who contracted with bail bond companies to secure release suffered, on average, four days of wealth-based detention before paying the non-refundable premium to a commercial bonding company. Thus, arrestees who eventually manage to pay the bond company's "[r]ansom"[18] to purchase their release, must still

---

[18] As Supreme Court Justice Arthur Goldberg observed more than 50 years ago in the Forward to the 1965 book by Ronald L. Goldfarb, *Ransom: A Critique of the American Bail System*, "If it is true that 'the quality of a nation's civilization can be largely measured by the methods it uses in the enforcement of its criminal law,' then the American bail system as it now operates can no longer be tolerated. At best, it is a system of checkbook justice; at worst, a highly commercialized racket."

spend days or weeks in jail due to their inability to pay while their family and friends try to come up with the money.[19]

169.    "Pretrial-release bonds" are a third type of bond. A pretrial-release bond is the term used for the low-cost bonds for which Dallas County's Pretrial Services Department screens arrestees. These bonds require arrestees to pay an administrative fee of either 3% of the full bond amount or $20, whichever is greater, to secure release. They are issued pursuant to Texas Code of Criminal Procedure Article 17.03(g) and Article 17.42.

170.    Arrestees who are released on pretrial-release bonds remain in jail an average of three days before being released.

171.    Dallas County's Pretrial Services agency—which is chronically understaffed and under-resourced as a matter of County policy, and does not provide meaningful pretrial supervision—screens arrestees for pretrial-release bonds according to criteria that the Dallas County Commissioners Court set forth in a generally applicable Order issued in 1999. Exhibit 9.

172.    The Order constitutes a policy decision regarding the categories of arrestees who are ineligible for pretrial release without paying the full amount of the secured financial condition required by the bail schedule. It renders the vast majority of arrestees ineligible for a pretrial-release bond.

173.    The criteria an arrestee must satisfy to be eligible for a pretrial-release bond, as set forth in the Order, include: (1) residence in Dallas County or an adjoining county and (2) the ability to provide contact information for two (previously four) "references" who can confirm both the arrestee's residence and employment.

---

[19] In this way, the use of surety bonds effectuates the transfer of wealth from some of the poorest members of the community to private for-profit companies and traps arrestees in cycles of debt and imprisonment. *See generally*, Campaign for Smart Justice, *Selling Off Our Freedom: How Insurance Corporations Have Taken Over Our Bail System* 26–33 (2017), available at https://colorofchange.org/bail-industry-report/.

174. Because people who are homeless have no residence that their "references" could "verify," the Commissioners' Order renders them categorically ineligible for pretrial-release bonds. This policy affects hundreds of people every month: in September 2017 alone, 399 people who were homeless were booked into the Dallas County Jail.

175. Arrestees are ineligible if they were convicted in the previous ten years of any violent felony, or if they were convicted in the last 12 months, or are currently charged with, any misdemeanor involving assault. Arrestees are also ineligible if they were convicted of a felony in the past year, or more than two felonies within the past ten years.[20]

176. Arrestees are ineligible if they have ever forfeited a bond in a felony case, if they forfeited a bond in a misdemeanor case in the last three years, or if they forfeited bonds in two misdemeanor cases in the past ten years.

177. Arrestees must "exhibit a demeanor which implies a willingness to cooperate with the conditions of Pre-Trial Release" to be eligible for a pretrial-release bond, a criterion that invites arbitrary and discriminatory decision-making by County employees making this decision.

178. Pretrial Services does not consider a person's ability to pay when determining eligibility.

179. Pretrial Services also does not consider the availability of non-financial alternative conditions of release that would reasonably assure appearance and community safety.

180. Because of the strict criteria set forth by the Commissioners in this written policy, the vast majority of arrestees are deemed ineligible for release on a pretrial-release bond. Once all

---

[20] This exclusion affects hundreds of impoverished arrestees every year because in Texas, many non-violent and minor offenses are crimes of poverty and are considered felonies, including, for example, third-offender theft under $750 (i.e. an enhanced misdemeanor offense). *See* Cary Aspinwall, *Why Dallas County Can Set $150,000 Bail for a $105 Shoplifting Charge—and How Taxpayers Lose*, Dall. Morning News, Dec. 29, 2016, available at https://www.dallasnews.com/news/social-justice-1/2016/12/29/dallas-county-demands-150000-bail-105-shoplifting-charge-taxpayers-lose. Many other felonies are non-violent drug possession charges.

of the restrictions on eligibility are applied, it is generally only first time offenders charged with non-violent offenses who are even eligible to receive pretrial-release bonds.

181.    Eligibility for pretrial-release bonds is never assessed prior to arraignment and booking.

182.    If a person appears to be eligible based on all the criteria in the Commissioner's Court's 1999 order, a pretrial services agent will interview the person after booking.

183.    Interviews generally take place the first business day after an arrest, but they can be delayed for several reasons, including that Pretrial Services agents work only Monday through Friday, so a person arrested on Thursday or Friday will not be assessed for eligibility until Monday or Tuesday at the earliest. In September 2017, 132 people were interviewed: an average of about 4.4 interviews per day. This number is typical.[21]

184.    During the interview, arrestees are asked to provide their current address, information about how they can be contacted, and employment information. Pretrial Services also asks the arrestee for the contact information of two or more "references" who will have to verify the arrestee's address before a pretrial-release bond can be granted.

185.    Pretrial Services does not collect information about the person's finances or education history, and does not screen arrestees to determine indigency.

186.    Not everyone who is interviewed will be released on a pretrial-release bond. For example, in September 2017, only 83 of the 132 people who were interviewed were released on a pretrial-release bond. In August 2017, only 99 of the 166 people who were interviewed were released on a pretrial-release bond. The gap between the number of people interviewed for pretrial-

---

[21] Between October 2016 and September 2017, the average monthly number of interviews was 153.5 (about 5 interviews per day). The number of interviews per month ranged from a low of 119 in June 2017 to a high of 199 in January 2017.

release bonds and the number of people released on pretrial-release bonds is due primarily to the fact that many arrestees are homeless, and that people's references cannot be contacted.

187.    Other arrestees who are interviewed are never released because their references cannot be reached or cannot confirm the arrestee's information.

188.    The raw numbers correspond to very low percentages of arrestees being released on pretrial-release bonds. In 2016, about 3.3% of people booked into the jail were released on pretrial-release bonds; in 2015, about 4.6% of people booked into the jail were released on pretrial-release bonds. As of September 2017, the year-to-date monthly average for 2017 was 3.2%.

189.    If the arrestee's information is not verified, she will not be released on a pretrial-release bond, though at any time during the verification process, an arrestee can pay the money bail amount required by the bail schedule and be freed.

190.    Some arrestees who cannot afford the money bail required for their release resolve their cases before the verification process can conclude.

191.    Even once the person's references are verified, release is not certain. The arrestee must then agree to follow the rules of the program, which include checking in by phone every two weeks with a Pretrial Service officer and agreeing to notify Pretrial Services of any new arrest or other court-related information, changes in address, or changes in any other information provided to Pretrial Services during the interview process.

192.    Contrary to best practices, Dallas County's Pretrial Services agency does not provide varying levels of supervision tailored to the arrestee's specific needs, and Pretrial Services agents and Judges do not impose the kind of non-financial conditions proven to mitigate heightened risks of nonappearance and new criminal activity, such as more intense supervision including in-person check-ins, drug treatment, mental health care, or curfews.

193.    If the Pretrial Services agent determines that the risk someone poses of nonappearance or new criminal activity cannot be effectively mitigated by the standard conditions, that person will be denied a pretrial-release bond.

194.    Finally, to be released on a pretrial-release bond, the arrestee must make an upfront monetary payment of 3% of the bond amount or $20, whichever is the greater amount, though this fee can be waived in the discretion of the Manager of Pretrial Services.

195.    An arrestee approved for release on a pretrial-release bond who cannot afford to pay the reduced fee required for release will be kept in jail for at least one more day: the Director, who has discretion to waive the fee, generally will not consider a waiver until the business day following approval of a pretrial-release bond. Thus, if the pretrial-release bond was approved on a Friday, and the arrestee cannot afford the fee, she will be kept in jail at least until Monday, although the Director routinely attempts to expedite the review process for people who are approved for pretrial-release bonds on a Friday.

196.    This policy further extends the wealth-based detention of those individuals who are deemed eligible for release pursuant to the County's strict criteria for pretrial-release bonds and yet are too poor to pay the fee.

197.    The County's strict criteria for pretrial-release bonds render the vast majority of arrestees ineligible to receive them.

198.    The fourth type of bond in Dallas County is a "personal recognizance bond," sometimes referred to as a "personal bond." Personal-recognizance bonds are unsecured bonds, meaning that the arrestee is released without any up-front payment, but will be required to pay the full amount of the bond if she fails to appear and the bond is forfeited.

199.     In 2016, people who were released on personal-recognizance bonds were kept in jail, on average, for more than three weeks (25 days) prior to release. Between January and September 2017, the average time to release for people released on personal-recognizance bonds was 19 days, with a high of 24 days in February 2017, and a low of 16 days in September 2017.

200.     In order to be released on a personal-recognizance bond, a person's attorney must either file a motion or informally ask the Judge to consider a request for a bond reduction.

201.     Some judges refuse to hear such a request until the case has been filed, i.e. one-to-three weeks after arrest, at a minimum.

202.     Since April 2017, Dallas County has begun to use personal-recognizance bonds to divert people with mental illnesses from the jail and to expedite the release of people booked into the jail who are suffering from mental illnesses.[22]

203.     People charged with certain offenses, or who have active warrants in other counties, are ineligible for mental-health bonds. As a matter of policy and practice, anyone who is homeless is deemed ineligible for a mental-health bond. In fact, very few arrestees with mental-health diagnoses are released on mental-health bonds; the rest are kept in jail, largely because they are homeless and cannot afford money bail. Most individuals who are released pursuant to this new policy spend several days in jail prior to their release.

      **D.**     **Defendants know that arrestees in Dallas County are kept in jail solely because they cannot afford money bail amounts set pursuant to the bail schedule without an inquiry and findings**

---

[22] The Dallas County Jail is the second-largest mental health care provider in Texas, second only to the Harris County Jail. One-third of inmates at the Dallas County Jail have a diagnosed mental illness. *See* Stephanie Kuo, *Dallas County Plan Strives To Help People With Mental Illness Avoid Unnecessary Jail Time*, KERA News, Apr. 5, 2017, available at http://keranews.org/post/dallas-county-plan-strives-help-people-mental-illness-avoid-unnecessary-jail-time.

204.    The Defendant Judges—and every other actor in the County's post-arrest system, as well as anyone who has observed the bail hearings (before they were closed to the public) or first appearances—know that many of the detained individuals who appear in front of them are being confined in jail solely because they are too poor to pay the money bail amount required by the predetermined schedule.

205.    Each Judge is aware of the Magistrates' well-settled, widespread practice of requiring secured money bail based on the bail schedule without an inquiry into or findings concerning an arrestee's present ability to pay the amount set.

206.    Each Judge knows that Magistrates refuse to consider ability to pay—indeed, that Magistrates have no financial information about arrestees, and therefore *cannot* consider ability to pay. Each Judge also knows that Magistrates do not make findings concerning alternative conditions of release during the bail-setting hearings.

207.    Each Judge knows that, as a result of these practices, thousands of individuals are detained in Dallas County every day solely because they are too poor to pay the money bail amounts imposed pursuant to the predetermined bail schedules that they promulgated.

208.    For example, Judges receive a "24-hour list," which is a list of individuals assigned to their court who were booked into the jail in the last 24 hours. From this list, each Judge can determine whether an arrestee is in jail solely because she is unable to pay a secured financial condition of release.

209.    Each Judge accepts guilty pleas and issues time-served sentences every day from arrestees who are in jail solely because of a money bail amount they cannot afford. Those same judges routinely find those arrestees to be indigent for purposes of appointing counsel.

210.    The Defendants know that, for thousands of arrestees in the jail every day, there is no reason for detention other than the inability to pay a secured financial condition of release.

211.    The Defendants know that secured money bail amounts are imposed in every case without an inquiry or findings concerning ability to pay and without consideration of or findings concerning alternatives, and without any of the findings or procedures required for a valid order of pretrial detention under federal law.

212.    The Judges are aware of the Magistrates' systemic failure to consider ability to pay.

213.    The Judges are also aware of the Magistrates' systemic failure to consider non-financial alternative conditions, or to make findings concerning ability to pay or the necessity of any particular condition of release to meet a specific government interest.

214.    Each Defendant Judge knows that the Sheriff's Department enforces the Magistrates' secured money bail orders for every individual the Sheriff's Department arrests, or accepts into custody after arrest by another agency, without an inquiry into or findings concerning the person's ability to pay the predetermined amount required and without meaningful consideration of alternative conditions of release.

215.    Each Judge has acquiesced in the Magistrates' custom of failing and refusing to consider ability to pay and of consistently requiring secured money bail that results in the pretrial detention of impoverished arrestees. Each Judge has also acquiesced in the Sheriff's enforcement of these unconstitutional detention orders. The misdemeanor and felony Judges have not taken any formal action to correct these constitutional violations.

216.    For example, the presiding judges of the felony and misdemeanor courts have each admitted to news outlets that they know people who cannot afford their bond under the bail schedule are detained just because they are poor. The presiding Judge of the misdemeanor courts

recently stated, "There's a lot of people who end up in jail who can't afford a bond, who lose their jobs, lose their apartment and end up homeless."[23]

217.     Yet the Judges have left the bail schedules in place, and have taken no formal action to correct the widespread practices that result in wealth-based detention. The Sheriff, too, knows that secured money bail is required of arrestees without any inquiry into or findings concerning a person's ability to pay the amount set. The Sheriff knows that bail is set in hearings that are closed to the public, during which arrestees are prohibited from presenting evidence or making any arguments.

218.     The Sheriff knows that secured money bail results in the post-arrest detention of hundreds of presumptively innocent arrestees every week, and thousands every month. The Sheriff has ready access to the list of detainees in her custody, which provides the basis for each inmate's detention, including whether any inmate would be released if she paid a monetary bail amount, and the amount of money that any inmate is required to pay for immediate release. The Sheriff therefore knows that the imposition of secured money bail results in systemic, wealth-based detention, and that there are thousands of people in the jail every night who would be released but for their inability to pay a predetermined money bail amount required pursuant to Dallas County's bail schedules.

219.     The Sheriff has discretion under state law to refuse to enforce unlawful orders.

220.     But, by policy and practice, the Sheriff chooses to enforce secured money bail amounts that operate as de facto orders of pretrial detention entered without any of the substantive findings or procedural safeguards required for valid orders of pretrial detention under federal law.

---

[23] Tanya Eiserer, *Dallas County Program to Get More Prisoners Out on Bond*, WFAA, Jun. 23, 2017, available at http://www.wfaa.com/news/local/dallas-county/dallas-county-program-to-get-more-prisoners-out-on-bond/451683951.

221.    The Sheriff enforces these de facto detention orders even though she knows or should know that they were issued without an inquiry and findings concerning ability to pay, without meaningful consideration of or findings concerning alternative less-restrictive conditions, without application of any transparent legal standard governing detention, and without the arrestee receiving notice and opportunity to be heard at an adversarial hearing. The Sheriff knows or should know that they operate to detain only impoverished arrestees.

222.    Even if the Judges and the Sheriff did not actually know about the foregoing practices and resulting constitutional violations, they would have constructive knowledge of them. These practices occur frequently and flagrantly. They result in severe and obvious constitutional violations, to which the Judges' and the Sheriff's attention has been called, and which have been the subject of considerable public debate:

    a.      Magistrates require arrestees to pay secured money bail pursuant to the bail schedule and without any individualized determination of ability to pay or the need for particular conditions of release in well over 100 cases every day.

    b.      Magistrates issue these orders flagrantly, by rote imposition of secured money bail amounts from the bail schedule in proceedings lasting approximately 60 seconds, without any inquiry into ability to pay. Indeed, the Magstrates do not have any information about the arrestees' ability to pay and do not permit arrestees to speak prior to conditions of release being determined. Sheriff's deputies attend these proceedings every day.

    c.      The constitutional violations resulting from the bail schedule are severe. People are locked in jail cells for days or weeks, without the rigorous procedures or

substantive findings required for issuing a valid order of preventive detention, just because they are poor.

d.     The constitutional violations resulting from the bail schedule are obvious. Arrestees do not get any meaningful opportunity to challenge the bail amounts mandated by the schedule for days or weeks. There can be little question that people who remain locked up are unable to afford their bail: immediately following arraignment, sheriff's deputies collect financial affidavits from people who are requesting appointed counsel because they are too poor to afford a lawyer. The Judges then make an affirmative finding that these individuals qualify for appointed counsel because they are, in fact, too poor to afford one. The Sheriff herself has ready access to a list of detainees, which shows that the vast majority of detainees in her jail are held pretrial under a secured bond they have not been able to pay. And it is no secret that this system is unconstitutional: Harris County, which operates the largest jail in Texas, was recently enjoined from detaining people using a bail schedule that operates in a substantially similar manner.

e.     The Judges and Sheriff have discussed these policies with other officials, system stakeholders, and affected people. They sit on a committee that discusses ways to reduce the jail population, including adoption of a pretrial assessment tool.

f.     There has been significant public discussion about Dallas's unconstitutional, ineffective, and costly post-arrest system. For example, the Dallas Morning News and other local news outlets have repeatedly reported on how the County's use of access to money to make release and detention decisions results in the systemic pretrial detention of impoverished arrestees. The Lyndon B. Johnson School of Public Affairs produced a white paper on pretrial detention highlighting Dallas as an example of

an unconstitutional system. The County's post-arrest system and its use of rigid secured money bail schedules have been topics of debate in the election for district attorney.

### E.     Detention in the Dallas County Jail Causes Serious and Irreparable Harm

223.     The Dallas County Jail is one of the largest jails in Texas. In 2016, the jail booked 67,122 people total: an average of 5,594 people every month, and 183 people every day.[24]

224.     On any given day, the vast majority of people in Dallas County Jail cells—almost 70%—are presumptively innocent people who are there because they cannot afford to make a monetary payment.

225.     One-third of the Dallas County Jail population has a mental illness.[25]

226.     The Dallas County Jail is a notoriously dangerous place. Between January 2012 and the present, 20 people died while being kept there in pretrial custody.[26]

227.     There is a documented history of inmate abuse by jail guards, deaths and suicides in the jail, inadequate training of jail staff, sexual abuse, and lack of access to medications and medical services.[27]

---

[24] Jail Population Committee Meeting Report, at 3 (Oct. 13, 2017), available at https://www.dallascounty.org/Assets/uploads/docs/criminal-justice/jail-pop/2017/2017%20-%2009.pdf.

[25] See Stephanie Kuo, *Dallas County Plan Strives To Help People With Mental Illness Avoid Unnecessary Jail Time*, KERA News, Apr. 5, 2017, available at http://keranews.org/post/dallas-county-plan-strives-help-people-mental-illness-avoid-unnecessary-jail-time.

[26] An analysis of the Texas Attorney General's Custodial Death Report revealed that at least 20 people died while in pretrial custody at the Dallas County Jail between January 1, 2012, and November 19, 2017. *See* Custodial Deaths Report, available at https://oagtx.force.com/cdr/cdrreportdeaths, and Dallas County Felony and Misdemeanor Courts Case Information, available at https://www.dallascounty.org/criminalBackgroundSearch/captcha.

[27] *See also* Cary Aspinwall & Stephanie Lamm, *Unresponsive: Women are Going to Jail in Need of Drug and Alcohol Treatment. Help Often Comes Too Late*, Dall. Morning News, Dec. 17, 2017, available at https://interactives.dallasnews.com/2017/ unresponsive/; Naomi Martin, *Brutal Killing Inside Dallas County Jail Leaves Experts Asking Whether It Could Have Been Prevented*, Dall. Morning News, Jan. 7, 2017, available at https://www.dallasnews.com/news/dallas-county/2017/01/07/brutal-killing-inside-dallas-county-jail-leaves-experts-asking-whether-prevented.

228.    For years, the County has been aware of these intolerable conditions, and has failed to remedy them.[28]

229.    None of the people being detained in the Dallas County Jail due to their inability to pay a secured financial condition of release received an inquiry into their ability to pay or consideration of alternative, less restrictive conditions. In no case were findings made that secured money bail was necessary to achieve any government interest. Only those individuals who are too poor to purchase their release are subjected to these conditions and to the health and safety risks of pretrial jailing.

**F.    Secured Money Bail Is Not as Effective as Many Other Methods in Securing Court Attendance or Public Safety**

230.    Empirical evidence does not show any relationship between monetary conditions of release and arrestees' rates of appearance in court.[29]

231.    While tying pretrial freedom to wealth status is the norm in Dallas County, other jurisdictions throughout the country do not detain people in jail because of their poverty. Instead

---

[28] *E.g.*, .D. Miles, *Caught On Video: Inmate Claims Abuse At Dallas County Jail*, CBS DGW, May 14, 2013, available at http://dfw.cbslocal.com/2013/05/14/caught-on-video-inmate-claims-abuse-at-dallas-county-jail/; Kevin Krause, *Dallas County Doesn't Want to Defend Jail Guards Accused of Causing Inmate's Death*, Dall. Morning News, May 5, 2010, available at https://www.dallasnews.com/news/crime/2010/05/04/dallas-county-doesnt-want-to-d; Kevin Krause, *UPDATE: Dallas County Jail Guard Arrested for Having Sex With An Inmate*, Dall. Morning News, July 23, 2009, available at https://www.dallasnews.com/news/crime/2009/07/23/dallas-county-jail-guard-arres-1; Kevin Krause, *Former Dallas County Jail Guard Alleges Abuse in the Slammer in Tell-All Book*, Dall. Morning News, Dec. 16, 2009, available at https://www.dallasnews.com/news/crime/2009/12/16/former-dallas-county-jail-guar; Diane Jennings, *Dallas County Detention Officer Accused of Sexually Abusing Inmate*, Dall. Morning News, Apr. 2, 2013, available at https://www.dallasnews.com/news/crime/2013/04/02/dallas-county-detention-officer-arrested-for-abusing-an-inmate; Kevin Krause, Dallas County Jail Guard Admits Inmate Danced for Her, Dec. 31, 2009, available at https://www.dallasnews.com/news/news/2009/12/31/20091230-Dallas-County-Jail-guard-admits-inmate-8227.

[29] *See e.g.*, Arpit Gupta et al., The Heavy Costs of High Bail: Evidence from Judge Randomization 5 (2016), available at http://www.columbia.edu/~cjh2182/ GuptaHansmanFrenchman.pdf ("We find no evidence that money bail increases the probability of appearance."); Michael Jones, Unsecured Bonds: The As Effective and Most Efficient Pretrial Release Option 3 (2013), available at http://www.pretrial.org/download/research/ Unsecured+Bonds,+The+As+Effective+and+Most+Efficient+Pretrial+Release+Option+-+Jones+2013.pdf ("Higher monetary amounts of secured bonds are associated with more pretrial jail bed use but not increased court apperance rates."); Claire M.B. Brooker *et al.*, *The Jefferson County Bail Project: Impact Study Found Better Cost Effectiveness for Unsecured Recognizance Bonds Over Cash and Surety Bonds* (Pretrial Justice Institute, June 2014) (finding that unsecured bail is equally effective as secured money bail at reasonably assuring appearing and mitigating the risk of new criminal activity).

of relying on money, other jurisdictions release arrestees with pretrial supervision practices and procedures that can help increase court attendance and public safety without requiring detention.

232.    Other jurisdictions employ numerous less restrictive methods of maximizing public safety and court appearances when necessary to guard against a particular risk. These include: unsecured bond (which do not require payment up front for release but instead allow immediate release upon a promise to pay the monetary amount if the person does not appear as required), phone and text message reminders of court dates, rides to court for those without transportation, pretrial supervision, counseling, stay-away orders, inpatient and outpatient treatment, and, in the most serious cases, curfew, home detention, and electronic GPS surveillance.

233.    Jurisdictions that make full use of less-restrictive alternative conditions of release achieve much higher release rates than Dallas County. While Dallas County releases only about half of all arrestees prior to disposition—many of whom are released only after days or weeks of illegal and unnecessary wealth-based detention, New York City releases 97% of all misdemeanor arrestees, and Washington, DC releases 94.5% of all arrestees.

234.    Defendants are permitted by state law to use these less-restrictive alternatives but, as a matter of routine, choose not to. Instead, Dallas County makes release and detention decisions on the basis of blunt access to cash, eschewing non-monetary alternatives that increase pretrial release while effectively mitigating risks of nonappearance or new criminal activity. As a matter of policy and practice, Defendants do not consider less restrictive alternatives to detention based on money bail that a person cannot afford.

235.    Jurisdictions with robust pretrial services and non-monetary conditions of release achieve court-appearance rates of 90% for all appearances throughout the life of the cases, with

more than 91% of those released pretrial remaining arrest-free (and 98-99% remaining arrest-free for violent crimes).

236.    Empirical evidence suggests that unsecured bond alone is just as effective at ensuring appearance in court as secured money bail.

237.    Moreover, studies show that those detained pretrial face worse outcomes at trial and sentencing than those released pretrial, even when charged with the same offenses. Detention on money bail increases the likelihood of conviction. One reason is that detained defendants are more likely to plead guilty just to shorten their jail time, even if they are innocent. Detained defendants also have a harder time preparing for their defense, gathering evidence and witnesses, and meeting with their lawyers.

238.    Using data from Philadelphia, researchers have found that a person who is detained pretrial is 13% more likely to be convicted and 21% more likely to plead guilty.[30] Additionally, individuals detained pretrial receive longer jail sentences.[31]

239.    People who are detained—instead of released on money bail or on a personal bond—when their case is resolved have significantly worse case outcomes.[32]

---

[30] Megan Stevenson, *Distortion of Justice: How the Inability to Pay Bail Affects Case Outcomes* 18 (Jan. 8, 2017), available at https://www.law.upenn.edu/cf/faculty/mstevens/workingpapers/Stevenson%20Job%20Market%20Paper%20Jan%202016.pdf; *see also* Gupta, et. al, *supra* note 29, at 13 (finding a 12% increase in the likelihood of conviction using the same data); Paul Heaton, et al., *The Downstream Consequences of Misdemeanor Pretrial Detention*, 69 Stan. L. Rev. 711 (2017).

[31] Stevenson, *supra* note 30, at 18; Heaton, *supra* note 30, at 21.

[32] Stevenson, *supra* note 30, at 18; Gupta, *supra* note 29, at 13 (finding a 12% increase in the likelihood of conviction using the same data); Heaton, *supra* note 30, at 21; Sarah R. Guidry, et al., *A Blueprint for Criminal Justice Policy Solutions in Harris County* 13, available at http://www.americanbar.org/content/dam/aba/events/legal_aid_indigent_defendants/2015/ls_sclaid_summit_03_tcjc_2015_harris_county_blueprint.authcheckdam.pdf ("[D]efendants who are not released pre-trial are more likely to be incarcerated following a conviction, and they generally receive longer sentences upon conviction."); Lise Olson, *Study: Inmates Who Can't Afford Bond Face Tougher Sentences*, Hous. Chron., Sept. 15, 2013, available at http://www.houstonchronicle.com/news/houston-texas/houston/article/Study-Inmates-who-can-t-afford-bond-face-tougher-4817053.php (discussing Carlos Mathis, an African-American man, who was held in jail for seven months on minor drug and theft charges because he could not afford money bail, and whose charges were dismissed); Isami Arifuku & Judy Wallen, *Racial Disparities at*

240.    Moreover, pretrial detention due to inability to pay money bail makes a person more likely to commit crime in the future and to fail to appear.[33]

241.    Studies also show that just two days of pretrial detention increases the likelihood of future arrests and future missed court appearances of low level offenders.

242.    Setting secured money bail without an inquiry into ability to pay and in an amount higher than a person can afford by definition defeats the purpose of money bail—to incentivize a person to return to court—and removes any legitimate (let alone compelling) state interest in requiring a financial condition.

243.    Nor is setting money bail without findings concerning ability to pay or consideration of alternatives the most narrowly tailored way to meet any other legitimate or compelling government interest.

244.    Pretrial detention causes instability in employment, housing, and care for dependent relatives.

---

*Pretrial and Sentencing and the Effects of Pretrial Services Programs* (2013), available at http://www.pretrial.org/download/research/Racial%20Disparities%20at%20Pretrial%20and%20Sentencing%20and%20the%20Effects%20of%20Pretrial%20Services%20Programs%20-%20NCCD%202013.pdf; Cynthia E. Jones, *"Give Us Free": Addressing Racial Disparities in Bail Determinations*, 16 N.Y.U. Legis. & Pub. Pol'y 919 (2013); Tina L. Freiburger, et. al, *The Impact of Race on the Pretrial Decision*, Am. J. of Crim. Just. (2010), available at http://libres.uncg.edu/ir/asu/f/Marcum_CD_2010_Impact_of_Race.pdf.

[33] Heaton, *supra* note 30, at 787; Lowenkamp, et al., *The Hidden Costs of Pretrial Detention* at 3, 19 (Nov. 2013), available at http://www.pretrial.org/download/research/The%20Hidden%20Costs%20of%20Pretrial%20Detention%20-%20LJAF%202013.pdf (studying 153,407 defendants and finding that "when held 2-3 days, low risk defendants are almost 40 percent more likely to commit new crimes before trial than equivalent defendants held no more than 24 hours"); Arnold Foundation, *Pretrial Criminal Justice Research Summary* 5 (2013), *available at*: http://www.arnoldfoundation.org/sites/default/files/pdf/LJAF-Pretrial-CJ-Research-brief_FNL.pdf (finding that "low-risk defendants held 2–3 days were 17 percent more likely to commit another crime within two years" and that those detained "4–7 days yielded a 35 percent increase in re-offense rates.").

245.    Pretrial detention is far more expensive than effective pretrial supervision programs. Through non-monetary tools, pretrial supervision programs can save taxpayer money while creating higher public safety and court appearance rates.

246.    The detention of arrestees who do not pose significant (let alone immitigable) risks but who cannot pay the required amount for release, is a main driver of the jail population.

247.    Defendants' use of money bail leads disproportionately to the detention of people of color. Regardless of the amount of money bail imposed, people of color are more likely to be detained at disposition than people who are white.[34]

248.    It costs Dallas County $225,321 *per day*—or $82.2 million per year—to incarcerate presumptively innocent people in the Dallas County Jail.[35]

249.    Researchers at the University of Pennsylvania recently published a study of the Harris County, Texas misdemeanor money bail system and concluded that if, from 2008 to 2013, those misdemeanor arrestees for whom the minimum $500 money bail was imposed had instead been released without requiring $500 money bail, the County would have released 40,000 additional people, avoided almost 5,900 criminal convictions, reduced incarceration days by more than 400,000, and prevented the commission of 1,600 felonies and 2,400 misdemeanors due to the criminogenic effects of even brief pretrial custody. The County would have saved roughly $20 million in supervision costs alone.[36]

---

[34] Megan Stevenson, *et al.*, *Bail Reform: New Directions for Pretrial Detention and Release* 8–9 (2017), available at http://scholarship.law.upenn.edu/cgi/viewcontent.cgi?article=2747&context=faculty_scholarship; Jones, *supra* note 32; Marie VanNostrand, *Legal and Evidence-Based Practices: Applications of Legal Principles, Laws, and Research to the Field of Pretrial Services* (2007) ("Research has identified financial terms of bail as resulting in disparate outcomes due to a person's financial status and may be a form of de facto racial and ethnic discrimination"); Stephen Demuth, *Racial and Ethnic Differences in Pretrial Release Decisions and Outcomes: A Comparison of Hispanic, Black, and White Felony Arrestees*, 41 Criminology 873 (2003).

[35] *See Dallas County, Texas, Adult Criminal Justice Data Sheet*, Texas Criminal Justice Coalition (2016), available at https://www.texascjc.org/system/files/publications/Adult%20Dallas%20County%20Data%20Sheet%202016_0.pdf.

[36] Heaton, *supra* note 30, at 787.

250.   Dallas County would almost certainly see similar or greater savings if Defendants stopped imposing and enforcing automatic secured financial conditions of release that operate to detain impoverished arrestees.

251.   Pretrial detention has devastating effects on people's lives, exacerbating the effects of poverty by causing people to lose jobs, housing, cars, medical care, and even child custody. Pretrial detention also leads to more crime, increases the likelihood that the arrestee will be convicted and sentenced to jail, and leads to longer jail sentences.

## Class Action Allegations

252.   The named Plaintiffs bring this action, on behalf of themselves and all others similarly situated, as a class action under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

253.   A class action is a superior means, and the only practicable means, by which the named Plaintiffs and unknown Class members can challenge the Defendants' unlawful wealth-based post-arrest detention scheme.

254.   This action is brought and may properly be maintained as a class action pursuant to Rule 23(a)(1)–(4) and Rule 23(b)(2) of the Federal Rules of Civil Procedure.

255.   This action satisfies the numerosity, commonality, typicality, and adequacy requirements of those provisions.

256.   The Plaintiffs propose one class, seeking declaratory and injunctive relief: All arrestees who are or will be detained in Dallas County custody because they are unable to pay a secured financial condition of release.

### A.   Numerosity and Impractability of Joinder. Fed. R. Civ. P. 23(a)(1).

257.   Every person who is detained in the Dallas County Jail because she cannot afford to pay money bail and has not been ordered detained pursuant to lawful procedures is subjected to

Defendants' wealth-based detention scheme in which an arrestee must either pay for her liberty or remain in a jail cell.

258.     The average daily jail population in 2016 was 5,338 people.[37]

259.     In September 2017, a typical month and the most recent month for which data could be located, the average daily population of misdemeanor arrestees being detained pretrial was 409 people. The average daily population of state-jail felony[38] arrestees being held pretrial was 253. And the average daily population of felony arrestees (excluding state-jail-felony arrestees) being held pretrial was 1,639. The vast majority of people being held prior to trial would be released if they could afford to pay a secured financial condition of release.[39]

260.     On any given day, there are hundreds of outstanding arrest warrants issued in Dallas County, and every day more are issued.

261.     Even arrestees who eventually pay the monetary amount required for release, or who are eventually released on unsecured bail, suffer wealth-based detention prior to being released. In 2016, arrestees who were released on surety bonds spent an average of four days in jail prior to release; arrestees who were released on pretrial-release bonds spent an average of two days in jail prior to release (between January and September 2017, the average increased to three

---

[37] Jail Population Committee Meeting Report, supra note 24, at 3.

[38] In the early 1990s, as part of its effort to address overcrowding in its state prisons and facilitate treatment during incarceration for people struggling with drug addiction, the Texas legislature created a new category of felony offense: the state jail felony. So-called "state jail" facilities were brought within the control of the Texas Department of Criminal Justice, and individuals convicted of state jail felonies were no longer sent to Texas prisons, but rather to "state jails." State-jail felony offenses are typically non-violent offense and, in many instances, are misdemeanor offenses enhanced by prior misdemeanor convictions. Although specific data on the frequency of charges is not available in Dallas County, in Harris County, a majority of state-jail felony charges are for possession of less than a gram of a controlled substance (40% of state-jail felony arrests), and third-offender theft under $2,500 (14%), which is a misdemeanor offense unless the person charged has two prior convictions for the same misdemeanor offense.

[39] Some are being held "no bond," meaning that they have been ordered detained pretrial, albeit without the procedures required for issuing a valid detention order. They are therefore not subjected to wealth-based detention, though their constitutional rights are being violated in other ways. Others would not be released from custody even if they paid the money bail amount because they are subject to out-of-county warrants, immigration detainers, or other holds, though they would be eligible for transfer to the jurisdiction that requires their presence.

days in jail); and arrestees who were released on personal bonds spent an average of 25 days in jail prior to release.

262.    The amount of time arrestees are held in jail depends on how long it takes them to come up with the money required for their release. Some arrestees are forced to wait days or weeks until they or family members can make the payment required by the surety comopany. Others will never be able to come up with any amount of money to pay for their release. The number of current and future arrestees subject to Defendants' policies and practices—if it is not enjoined—numbers well into the tens of thousands every year.

263.    Joinder is impracticable because the members of the class are impoverished and cannot hire lawyers to bring independent claims.

**B.      Commonality. Fed. R. Civ. P. 23(a)(2).**

264.    Common questions of law and fact exist as to all members of the class. The named Plaintiffs seek common relief concerning whether the Defendants' wealth-based policies, practices, and procedures violate the rights of the class members, and relief mandating that the Defendants stop these constitutional violations.

265.    The Plaintiffs' claims raise common legal and factual questions arising from one central set of policies and practices: Defendants' post-arrest wealth-based detention scheme. Defendants operate this scheme openly and in materially the same manner every day with respect to all arrestees. Resolution of these legal and factual issues will determine whether all of the members of the class are entitled to the constitutional relief that they seek.

266.    Among the most important common questions of fact for the class are:

- Whether the Defendants have a policy and practice of determining the amount of money required to secure post-arrest release without inquiry into ability to pay or consideration of or findings concerning alternative conditions of release;

- Whether the Defendants require an amount of money be paid up front before

releasing a person from the jail;

- Whether Defendants, at any stage in the post-arrest process, inquire into a person's ability to pay the predetermined amount of money, or make findings concerning an arrestee's present ability to pay any amount set or that any particular condition of release is necessary to address a specific government interest;

- How long arrestees must wait in jail after arrest before they have an opportunity to raise their inability to pay for their release or to request alternative, non-financial conditions.

267.    Among the most important common questions of law are:

- Whether requiring arrestees to pay money up front to secure release from post-arrest detention without an inquiry into or findings concerning the arrestee's present ability to pay the amount required, and without meaningful consideration of less restrictive alternative conditions of release, violates the Fourteenth Amendment's Due Process and Equal Protection clauses;

- Whether it is lawful to impose a secured financial condition of release that operates as a de facto order of pretrial detention because of a person's inability to pay without complying with the substantive findings, legal standards, and procedures required for issuing and enforcing a transparent order of preventive detention.

**C.    Typicality. Fed. R. Civ. P. 23(a)(3).**

268.    The Named Plaintiffs' claims are typical of the claims of the other members of the class. Each class member suffers the same injury because Defendants refuse to comply with basic constitutional requirements: class members are confined in jail because they could not afford to pay the Defendants' secured money bail. The answer to whether the Defendants' policies and practices are unconstitutional will determine the claims of the Named Plaintiffs and every other class member.

**D.    Adequacy. Fed. R. Civ. P. 23(a)(4).**

269.    The Named Plaintiffs are adequate representatives of the class because their interests in the vindication of the legal claims they raise are entirely aligned with the interests of the other class members, each of whom has the same basic constitutional claims.  The Named Plaintiffs are members of the class, and their interests do not conflict with those of the other class members.

270.    There are no known conflicts of interest among members of the proposed class. All of the members of the class have a similar interest in vindicating their constitutional rights in the face of Defendants' pay-for-freedom post-arrest detention system.

271.    Plaintiffs are represented by attorneys from Civil Rights Corps, Texas Fair Defense Project, the American Civil Liberties Union, and the American Civil Liberties Union of Texas, who have experience litigating complex civil rights matters in federal court and extensive knowledge of both the details of Defendants' scheme and the relevant constitutional and statutory law. Counsels' relevant qualifications are more fully set forth in the contemporaneously filed Motion for Class Certification.

272.    The combined efforts of class counsel have so far included extensive investigation into fixed money bail schemes over a period of months, including numerous interviews with witnesses, court employees, jail inmates, families, judges, attorneys practicing in courts throughout the region, community members, statewide experts in the functioning of state and local courts, empirical researchers, and national experts in constitutional law, post-arrest procedure, law enforcement, judicial procedures, criminal law, pretrial services, and jails.

273.    Class counsel have a detailed understanding of state law and practices as they relate to federal constitutional requirements. Counsel have studied the way that these systems function in other cities and counties in order to investigate the wide array of lawful options in practice for municipalities.

274.    Counsel have devoted significant time and resources to becoming intimately familiar with Defendants' scheme and with all of the relevant state and federal laws and procedures that can and should govern it. Counsel have also developed relationships with many of the individuals and families victimized by unlawful wealth-based pretrial detention practices. The

interests of the members of the class will be fairly and adequately protected by the Plaintiffs and their attorneys.

### E. Injunctive or Declaratory Relief. Rule 23(b)(2).

275.     Class action status is appropriate because the Defendants, through the policies, practices, and procedures that make up its wealth-based post-arrest detention scheme, have acted in the same unconstitutional manner with respect to all class members. The Defendants apply and enforce a wealth-based system of pretrial justice: some arrestees can purchase their immediate release, while other arrestees must remain in jail solely because they cannot pay.

276.     The class therefore seeks declaratory and injunctive relief that will prevent the Defendants from detaining arrestees who cannot afford cash payments. Because the putative class challenges the Defendants' scheme as unconstitutional through declaratory and injunctive relief that would apply the same relief to every member of the class, Rule 23(b)(2) is appropriate and necessary.

### <u>Claims for Relief</u>

**Count One: Defendants Violate Plaintiffs' Equal Protection and Due Process Right Against Wealth-Based Detention by Jailing Them Because They Cannot Afford A Monetary Payment.**

277.     Plaintiffs incorporate by reference the allegations in paragraphs 1-262.

278.     The Fourteenth Amendment's Equal Protection and Due Process Clauses prohibit jailing a person because of her inability to make a monetary payment. Defendants violate Plaintiffs' substantive right against wealth-based detention by enforcing against them a system of wealth-based detention that keeps them in jail solely because they cannot afford to make a monetary payment. Defendants also infringe Plaintiffs' rights to the presumption of innocence and to a fair trial.

**Count Two: Defendants Violate Plaintiffs' Right to Pretrial Liberty by Jailing Them Without Procedural Due Process.**

279.    Plaintiffs incorporate by reference the allegations in paragraphs 1-264.

280.    The Fourteenth Amendment protects the fundamental substantive right to pretrial liberty, the presumption of innocence, and the right to a fair trial.

281.    The Due Process Clause prohibits the government from depriving anyone of the fundamental right to pretrial liberty without notice that a hearing will occur, that the issue at the hearing will be whether the arrestee is a flight risk or poses a danger to the community, and a neutral decision-maker to preside over the hearing. The arrestee must have an opportunity to testify at the hearing, to present evidence on her behalf, and to contest the evidence offered against the arrestee.

282.    Further, to issue a transparent order of pretrial detention—or to issue a de facto order of pretrial detention by requiring a condition of release that operates to detain—the judicial officer must make written findings, on the record, that no condition or combination of conditions could reasonably assure the appearance of the person in court and the safety of any other person or the community, and she must explain her reasons for so concluding.

283.    Defendants violate Plaintiffs' fundamental right to pretrial liberty by requiring secured money bail amounts that operate to detain without making these substantive findings or providing these necessary procedures.

### Requests for Relief

WHEREFORE, Plaintiffs and the other Class members request that this Court issue the following relief:

a.   A declaratory judgment that Defendants violate the Named Plaintiffs' and class members' constitutional rights by operating a system of wealth-based detention that keeps them in jail because they cannot afford to pay a secured financial condition of release required

without an inquiry into or findings concerning ability to pay, without consideration of non-financial alternatives, and without findings that a particular release condition—or pretrial detention—is necessary to meet a compelling government interest;

b. An order preliminarily and permanently enjoining Defendants from operating and enforcing a system of wealth-based detention that keeps the Named Plaintiffs and class members in jail because they cannot afford a secured financial condition of release required without an inquiry into or findings concerning ability to pay, without consideration of non-financial alternatives, and without any findings that a particular release condition—or pretrial detention—is necessary to meet a compelling government interest.

c. Any other order and judgment this Court deems necessary to preliminarily and permanently enjoin Defendants—whether acting on behalf of the State, the County, or some other government entity—from implementing and enforcing a system of wealth-based pretrial detention that keeps arrestees in jail because they cannot afford a secured financial condition of release required without an inquiry into or findings concerning ability to pay, without consideration of non-financial alternatives, and without any findings that a particular release condition—or pretrial detention—is necessary to meet a compelling government interest;

d. An order certifying the class defined above;

e. An order and judgment granting reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988, and any other relief this Court deems just and proper.

Respectfully submitted,

/s/ *Elizabeth Rossi*
Elizabeth Rossi* (*Pro Hac Vice* Application forthcoming)
Maryland Attorney No. 1412180090
Alec Karakatsanis (*Pro Hac Vice* Application forthcoming)
D.C. Bar No. 999294
Premal Dharia (*Pro Hac Vice* Application forthcoming)
D.C. Bar No. 484091
Civil Rights Corps
910 17th Street NW, Suite 200
Washington, DC 20006
Tel: 202-599-0953
Fax: 202-609-8030
elizabeth@civilrightscorps.org
alec@civilrightscorps.org
premal@civilrightscorps.org

*Admitted solely to practice law in Maryland; not admitted in the District of Columbia. Practice is limited pursuant to D.C. App. R. 49(c)(3).*

/s/ Trisha Trigilio
Trisha Trigilio
Texas Bar No. 24065179
Andre Segura
N.Y. Bar No. 5021647
American Civil Liberties Union Foundation of Texas
1500 McGowen Street, Suite 250
Houston, Texas 77004
Tel: 713.942.8146
Fax: 713.942.8966
ttrigilio@aclutx.org

/s/ Kali Cohn
Kali Cohn
Texas Bar. No. 24092265
American Civil Liberties Union Foundation of Texas
6440 N. Central Expressway
Dallas, TX 75206
Tel: 214-346-6577
Fax: 713-942-8966
kcohn@aclutx.org

/s/Brandon J. Buskey
Brandon J. Buskey
Alabama Bar Number: ASB-2753-A50B
American Civil Liberties Union Foundation
Criminal Law Reform Project
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 284-7364
Fax: (212) 549-2654
bbuskey@aclu.org

*/s/ Susanne Pringle*
Susanne Pringle
Texas Bar No. 24083686
springle@fairdefense.org
Emily Gerrick (Application for Admission forthcoming)
Texas Bar No. 24092417
Texas Fair Defense Project
314 E. Highland Mall Blvd., Suite 180
Austin, Texas 78752
Telephone: (512) 637-5220
Facsimile: (512) 637-5224

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 21st day of January, 2018, I electronically filed the foregoing with the clerk of the court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court. The Summons and Complaint will be served in accordance with the Federal Rules of Civil Procedure.

By:     <u>/s/ *Elizabeth Rossi*</u>
Elizabeth Rossi* (*Pro Hac Vice* Application forthcoming)
Maryland Attorney No. 1412180090
Civil Rights Corps
910 17th Street NW, Suite 200
Washington, DC 20006
Tel: 202-599-0953
Fax: 202-609-8030
elizabeth@civilrightscorps.org

*Admitted solely to practice law in Maryland; not admitted in the District of Columbia. Practice is limited pursuant to D.C. App. R. 49(c)(3).