IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

_____

SHANNON DAVES,                                          )
SHAKENA WALSTON,                                     )
ERRIYAH BANKS,                                            )
DESTINEE TOVAR,                                          )
PATROBA MICHIEKA,                                     )
JAMES THOMPSON,                                        )
                                                                          )
      On behalf of themselves and all               )
      others similarly situated,                             )
                                                                          )
          Plaintiffs,                                    )
                                                                          )
v.                                                                       )
                                                                          )   Case No. 3:18-CV-154
DALLAS COUNTY, TEXAS,                             )
                                                                          )
SHERIFF MARIAN BROWN,                            )
                                                                          )
TERRIE MCVEA,                                             )
LISA BRONCHETTI,                                         )
STEVEN AUTRY,                                             )
ANTHONY RANDALL,                                     )
JANET LUSK,                                                   )
HAL TURLEY,                                                  )
       Dallas County Magistrates                   )
                                                                          )
ERNEST WHITE (194TH),                              )
HECTOR GARZA (195TH),                            )
TERESA HAWTHORNE (203RD),                 )
TAMMY KEMP (204TH),                               )
JENNIFER BENNETT (265TH),                      )
AMBER GIVENS-DAVIS (282ND),             )
LIVIA LIU FRANCIS (283RD)                        )
STEPHANIE MITCHELL (291ST),                 )
BRANDON BIRMINGHAM (292ND),          )
TRACY HOLMES (363RD),                           )
ROBERT BURNS (NO. 1),                             )
NANCY KENNEDY (NO. 2),                         )
GRACIE LEWIS (NO. 3),                              )
DOMINIQUE COLLINS (NO. 4),                  )

CARTER THOMPSON (NO. 5),                              )
JEANINE HOWARD (NO. 6),                               )
STEPHANIE FARGO (NO. 7),                              )
     Judges of Dallas County Criminal District Courts    )
                                                         )
DAN PATTERSON (NO. 1),                               )
JULIA HAYES (NO. 2),                                 )
DOUG SKEMP (NO. 3),                                  )
NANCY C. MULDER (NO. 4),                             )
LISA GREEN (NO. 5),                                  )
ANGELA KING (NO. 6),                                 )
ELIZABETH CROWDER (NO. 7),                           )
TINA YOO CLINTON (NO. 8),                            )
PEGGY HOFFMAN (NO. 9),                               )
ROBERTO CANAS, JR. (NO. 10),                         )
SHEQUITTA KELLY (NO. 11),                            )
     Judges of Dallas County Criminal Courts at Law      )
                                                         )
          Defendants.                               )
_____)

## BRIEF IN SUPPORT OF THE NAMED PLAINTIFFS' MOTION FOR CLASS-WIDE PRELIMINAY INJUNCTION

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 2

STANDARD OF REVIEW ................................................................................................. 2

STATEMENT OF FACTS ................................................................................................. 3

    I.   The Named Plaintiffs ............................................................................................. 4

    II.  Defendants' Wealth-Based System....................................................................... 4

    III.  Arrestees who cannot afford to pay secured money bail will be detained in the Dallas County Jail for days or weeks due to their inability to pay ...................................................... 15

    IV.  Detention in the Dallas County Jail Causes Serious and Irreparable Harm .................... 16

    V.  Alternatives to Dallas County's Wealth-Based Post-Arrest System are Readily Available ......................................................................................................................... 17

ARGUMENT ................................................................................................................... 18

    I.   Introduction.......................................................................................................... 18

    II.  Dallas County's Wealth-Based Bail Practices Violate Plaintiffs' Substantive Constitutional Rights Against Wealth-Based Detention and to Pretrial Liberty ...................... 20

    A.  The Equal Protection and Due Process Clauses Protect the Substantive Right Against Wealth-Based Detention ............................................................................................ 20

    III.  Absent an Injunction, Plaintiffs and Class Members Will Suffer Irreparable Harm, the Requested Relief Will Not Harm Defendants, and the Issuance of an Injunction Will Serve the Public Interest ........................................................................................................ 34

    IV.  The Court Should Use Its Discretion Not to Require the Posting of Security.................. 40

Conclusion ....................................................................................................................... 41

# TABLE OF AUTHORITIES

## Cases

*Barker v. Wingo*, 407 U.S. 514 (1972) ................................................................. 33

*Bass v. Richardson*, 338 F. Supp. 478 (S.D.N.Y. 1971) .......................................... 38

*Bearden v. Georgia*, 461 U.S. 600 (1983) ........................................................ passim

*Brangan v. Commonwealth*, 80 N.E.3d 949 (Mass. 2017) .................................. 23, 24

*Buffin v. San Franciso*, No. 15-cv-04959 (Jan. 16, 2018) ................................. 3, 20, 23

Order, *Burks v. Scott Cnty.*, No. 3:14-CV-745, ECF. No. 108 (S.D. Miss. June 26, 2017) ......... 21

*Byrum v. Landreth*, 566 F.3d 442 (5th Cir. 2009) ...................................................... 3

*Carlisle v. Desoto Cty.*, No. 09-CV-212, 2010 WL 3894114 (N.D. Miss. Sept. 30, 2010) ......... 23

*City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*, 636 F.2d 1084 (5th Cir. 1981) .......... 37, 38

*Cobb v. Green*, 574 F.Supp. 256 (W.D. Mich. 1983) .................................................. 32

*Concrete Pipe & Prods. v. Constr. Laborers Pension Tr.*, 508 U.S. 602 (1993) ....................... 29

*Cooper v. City of Dothan*, No. 15-CV-425, 2015 WL 10013003 (M.D. Ala. 2015) ............... 3, 38

*Davis v. State*, 956 S.W.2d 555 (Tex. Crim. App. 1997) ............................................... 7

*Foucha v. Louisiana*, 504 U.S. 71 (1992) ...................................................... 16, 22, 32

*Frazier v. Jordan*, 457 F.2d 726 (5th Cir. 1972) ................................................... 18, 20

*Fuentes v. Shevin*, 407 U.S. 67 (1972) .................................................................. 29

*G & V Lounge v. Mich. Liquor Control Comm.*, 23 F.3d 1071 (6th Cir. 1994) ........................ 35

*Gagnon v. Scarpelli*, 411 U.S. 778 (1973) ............................................................. 28

*Gambling Paraphernalia, Devices, Equipment, & Proceeds v. State*, 22 S.W.3d 625 (Tex. App.—Dall. 2000, no pet.) ........................................................................... 7

*Giovani Carandola v. Bason*, 303 F.3d 507 (4th Cir. 2002) .......................................... 35

*Gooch v. Life Investors Ins. Co. of Am.*, 672 F.3d 402 (6th Cir. 2012) ............................. 38

*Ill. League of Advocates for the Developmentally, Disabled v. Ill. Dep't of Human Servs.*, No. 13-CV-1300, 2013 WL 3287145 (N.D. Ill. June 28, 2013) .......................................... 38

*Janvey v. Alguire*, 647 F.3d 585 (5th Cir. 2011) ....................................................... 3

*Johnson v. Bd. of Police Comm'rs*, 351 F. Supp. 2d 929 (E.D. Mo. 2004) .............................. 38

*Jones ex rel. Varden v. City of Clanton*, No. 15-CV-34, 2015 WL 5387219 (M.D. Ala. Sept. 14, 2015) ................................................................................................................................ 3, 30

*Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454 (1989) ................................................................ 25

*Lake v. Speziale*, 580 F. Supp. 1318 (D. Conn. 1984) ................................................................ 32

*Lee v. Orr*, No. 13-CV-8719, 2013 WL 6490577 (N.D. Ill. Dec. 10, 2013) .............................. 38

*Leisner v. N.Y. Tel. Co.*, 358 F. Supp. 359 (S.D.N.Y. 1973) ...................................................... 38

*Lopez-Valenzuela v. Arpaio*, 770 F.3d 772 (9th Cir. 2014) (en banc) .................................. 16, 22

*Mathews v. Eldridge*, 424 U.S. 319 (1976) ........................................................................... 25, 27

Preliminary Injunction Order, *Mitchell v. City of Montgomery*, No. 14-CV-186, ECF No. 18 (M.D. Ala. May 1, 2014) ......................................................................................................... 38

*M.L.B. v. S.L.J.*, 519 U.S. 102 (1996) ....................................................................................... 18

*Morrissey v. Brewer*, 408 U.S. 471 (1972) ................................................................................ 29

*N.Y. State Nat. Org. For Women v. Terry*, 697 F. Supp. 1324 (S.D.N.Y. 1988) ........................ 38

*ODonnell v. Harris County*, 251 F. Supp. 3d 1052 (S.D. Tex. 2017) ................................. passim

*Pierce v. City of Velda City*, No. 15-CV-570, 2015 WL 10013006 (E.D. Mo. 2015) .................. 3

*Pugh v. Rainwater*, 572 F.2d 1053 (5th Cir. 1978) (en banc) .............................................. passim

*Rodriguez v. Providence Community Corrections, Inc.*, 155 F. Supp. 3d 758  (M.D. Tenn. 2015) ................................................................................................................................ 3, 21, 32, 38

*S.E.C. v. Bankers Alliance Corp.*, No. 95-CV-0428, 1995 WL 317586 (D.D.C. May 10, 1995)  32

*San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1 (1973) ................................................. 18

*Shapiro v. Thompson*, 394 U.S. 618 (1969) ............................................................................... 20

*Simms v. District of Columbia*, 872 F. Supp. 2d 90 (D.D.C. 2012) ........................................... 35

*Simpson v. Miller*, 387 P.3d 1270 (Ariz. 2017) ........................................................................ 23

*Snow v. Lambert*, No. 15-CV-567, 2015 WL 5071981 (M.D. La. 2015) ..................................... 3

*Stack v. Boyle*, 342 U.S. 1 (1951) ............................................................................................. 23

*State v. Brown*, 338 P.3d 1276 (N.M. 2014) .............................................................................. 25

*Steward v. West*, 449 F.2d 324 (5th Cir. 1971) ......................................................................... 38

*Swanson v. Univ. of Hawaii Prof. Assembly*, 269 F. Supp. 2d 1252 (D. Haw. 2003) ................. 38

*Swarthout v. Cooke*, 562 U.S. 216 (2011) ................................................................................. 25

*Tate v. Short*, 401 U.S. 395 (1971) ............................................................................ 17

*Thompson v. City of Moss Point*, No. 15-CV-182, 2015 WL 10322003 (S.D. Miss. 2015) .......... 3

*Turner v. Rogers*, 564 U.S. 431 (2011)................................................................... 26, 29

*United States v. Accetturo*, 783 F.2d 382, 389 (3d Cir. 1986).................................... 29

*United States v. Acevedo–Ramos*, 755 F.2d 203 (1st Cir. 1985) ................................. 29

*United States v. Bogle*, 855 F.2d 707 (11th Cir. 1988)............................................... 32

*United States v. LaFontaine*, 210 F.3d 125 (2d Cir. 2000).......................................... 29

*United States v. Leathers*, 412 F.2d 169 (D.C. Cir. 1969)........................................... 24

*United States v. LeClercq*, No. 07-80050-CR, 2007 WL 4365601 (S.D. Fla. Dec. 13, 2007) ..... 24

*United States v. Mantecon-Zayas*, 949 F.2d 548 (1st Cir. 1991)................................. 24

*United States v. McConnell*, 842 F.2d 105 (5th Cir. 1988) .......................................... 24

*United States v. Payan*, 992 F.2d 1387 (5th Cir. 1993) ............................................... 26

*United States v. Salerno*, 481 U.S. 739 (1987) ................................................... passim

*United States v. Scales*, 639 F. App'x 233 (5th Cir. 2016)........................................... 26

*Van Atta v. Scott*, 613 P.2d 210 (Cal. 1980) ............................................................. 33

*Walker v. City of Calhoun*, No. 15-CV-170, 2017 WL 2794064 (N.D. Ga. Jan. 28, 2016).. passim

*Wanatee v. Ault*, 120 F.Supp.2d 784 (N.D. Iowa 2000) ............................................. 32

*Washington v. Harper*, 494 U.S. 210 (1990) ........................................... 16, 30, 39, 41

*Wayne Chem. v. Columbus Agency Serv. Corp.*, 567 F.2d 692 (7th Cir. 1977) ........................... 37

*Williams v. Farrior*, 626 F. Supp. 983 (S.D. Miss. 1986) .......................................... 23

*Williams v. Illinois*, 399 U.S. 235 (1970) ................................................................. 17

*Wolff v. McDonnell*, 418 U.S. 539 (1974) ................................................................. 29

*Youngberg v. Romeo*, 457 U.S. 307 (1982) ............................................................... 16

*Zadvydas v. Davis*, 533 U.S. 678 (2001) ............................................................. 22, 32

**Statutes**

18 U.S.C. § 3142(c)(2).............................................................................................. 30

D.C. Code § 23-1321 ................................................................................................ 30

Tex. Gov't Code Ann. § 54.301(a) ............................................................................. 7

Tex. Gov't Code Ann. § 54.401(c) ........................................................................ 7

Tex. Gov't Code Ann. § 54.875(b) ....................................................................... 7

**Other Authorities**

11A Wright & Miller § 2954 .............................................................................. 38

Arnold Foundation, *Pretrial Criminal Justice Research Summary* (2013) .................................. 36

Arpit Gupta et al., *The Heavy Costs of High Bail: Evidence from Judge Randomization* (2016) ........................................................................................... 14, 34

Bernie Tafoya, *Cook County Jail Population Sees a Record Low*, CBS Chi., Dec. 22, 2017 ..... 31

Brentin Mock, *How New Jersey in Leading the Post-Bail* Revolution, CityLab, Nov. 2, 2017 .. 31

Brief for American Bar Association as *Amicus Curiae*, *ODonnell*, No. 17-20333, 2017 WL 3536469 (5th Cir. Aug. 9, 2017) ...................................................................... 27

Brief of Conference of Chief Justices as *Amicus Curiae*, *ODonnell v. Harris Cnty.*, No. 17-20333, 2017 WL 3536467 (5th Cir. Aug. 9, 2017) ................................................... 27

Brief of United States as *Amicus Curiae*, *Walker v. City of Calhoun*, No. 17-13139 (11th Cir. Aug. 9, 2017) ...................................................................................... 27

Bureau of Justice Statistics, *Sexual Victimization In Prisons and Jails Reported By Inmates, 2011-12-Update* ..................................................................................... 34

Cary Aspinwall & Stephanie Lamm, *Unresponsive: Women are Going to Jail in Need of Drug and Alcohol Treatment. Help Often Comes Too Late*, Dall. Morning News, Dec. 17, 2017 .. 14, 35

Christopher T. Lowenkamp et al., *Investigating the Impact of Pretrial Detention on Sentencing Outcomes* (Nov. 2013) ..................................................................... 33, 34, 36

*Dallas County, Texas, Adult Criminal Justice Data Sheet*, Texas Criminal Justice Coalition (2016) ............................................................................................. 36

Diane Jennings, *Dallas County Detention Officer Accused of Sexually Abusing Inmate*, Dall. Morning News, Apr. 2, 2013 ......................................................................... 14

Int'l Ass'n of Chiefs of Police, Resolution (October 2014), 121st Annual Congress ................. 37

J.D. Miles, *Caught On Video: Inmate Claims Abuse At Dallas County Jail*, CBS DGW, May 14, 2013 ................................................................................................. 14

Jail Population Committee Meeting (Apr. 14, 2017) ....................................................... 13

Kevin Krause, *Dallas County Doesn't Want to Defend Jail Guards Accused of Causing Inmate's Death*, Dall. Morning News, May 5, 2010 ............................................................. 14

Kevin Krause, Dallas County Jail Guard Admits Inmate Danced for Her, Dec. 31, 2009 .......... 14

Kevin Krause, *Former Dallas County Jail Guard Alleges Abuse in the Slammer in Tell-All Book*, Dall. Morning News, Dec. 16, 2009 ......................................................................................... 14

Kevin Krause, *UPDATE: Dallas County Jail Guard Arrested for Having Sex With An Inmate*, Dall. Morning News, July 23, 2009 ........................................................................................... 14

Mean Crepeau, *Cook County Jail Drops Below 6,000 Inmates to Lowest Level in Decades*, Chi. Trib., Dec. 22, 2017 ..................................................................................................................... 31

Michael Jones, *Unsecured Bonds: The As Effective and Most Efficient Pretrial Release Option* (2013) ............................................................................................................................................ 14

Moore's Federal Practice § 23.50 ................................................................................................... 38

Naomi Martin, *'Badley Needed': Dallas First Responders Laud New Ways to Help Mentally Ill in 2017*, Dall. Morning News, Dec. 19, 2016 ........................................................................... 14

Naomi Martin, *Brutal Killing Inside Dallas County Jail Leaves Experts Asking Whether It Could Have Been Prevented*, Dall. Morning News, Jan. 7, 2017 .................................................. 14, 35

National Sheriffs' Association, Resolution 2012-6 ........................................................................ 37

Newberg on Class Actions § 24:83 (4th ed. 2002) ....................................................................... 38

Paul Heaton et al., *The Downstream Consequences of Misdemeanor Pretrial Detention*, 69 Stan. L. Rev. 711 (2017) ............................................................................................................... 34, 36

Tim Schnacke, *Fundamentals of Bail: A Resources Guide for Pretrial Practitioners and a Framework for American Pretrial Reform*, United States Department of Justice, National Institute of Corrections (2014) ......................................................................................... 4, 36, 37

United States Department of Justice, Statement of Interest, *Varden et al. v. City of Clanton*, 15-CV-34, ECF No. 26 (M.D. Ala. Feb. 13, 2015) ....................................................................... 33

Vera Institute of Justice, *The Price of Jails: Measuring the Taxpayer Cost of Local Incarceration* (2015) ............................................................................................................................................ 36

**Rules**

Federal Rule of Civil Procedure 65(c) ........................................................................................... 37

## INTRODUCTION

Plaintiffs Shannon Daves, Shakena Walston, Erriyah Banks, Destinee Tovar, Petroba Michieko, and James Thompson are recent arrestees confined in jail cells at the Dallas County Jail. No court has found that their pretrial detention is required. They are detained only because they cannot afford to pay an amount of money set automatically under Dallas County policy, according to a predetermined money bail schedule, without any inquiry into their ability to pay and without any consideration of alternative, non-financial conditions of release.

Because the Named Plaintiffs are too poor to pay the predetermined money bail amounts, the financial conditions of *release* required by Defendants are instead de facto orders of detention. These orders of detention were imposed without any of the procedural protections, legal standards, or substantive findings that must accompany an order of pretrial detention under well-settled federal law. Due Process and Equal Protection prohibit Defendants' policy and practice of making release and detention decisions solely on the basis of blunt access to cash.

Accordingly, the Named Plaintiffs seek a preliminary injunction with respect to Claims I and II on behalf of themselves and all other current and future presumptively innocent arrestees who are or will be in Dallas County custody. This Court should preliminarily enjoin Dallas County from enforcing its wealth-based pretrial detention system, and order the County to provide the procedural safeguards and substantive findings that the Constitution requires before the preventively detaining any presumptively innocent individuals.[1]

## STANDARD OF REVIEW

---

[1] The question of whether a de facto money-based detention order without consideration of alternatives satisfies equal protection and due process is distinct from whether unattainably high money bail is also "excessive" under the Eighth Amendment or in violation of Texas law. The Court need not resolve the latter questions to rule on this motion.

A preliminary injunction is warranted if the movant demonstrates: "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest." *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011); *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009); *ODonnell v. Harris County*, 251 F. Supp. 3d 1052, 1132–33, 1156–59 (S.D. Tex. 2017). The Named Plaintiffs satisfy each of these requirements.

## STATEMENT OF FACTS

The facts of this case are similar to—albeit more extreme than—the unconstitutional post-arrest policies and procedures in Harris County, Texas, that Chief Judge Lee H. Rosenthal enjoined in April 2017.[2] *ODonnell*, 251 F. Supp. 2d at 1059 (issuing classwide preliminary injunction striking down Harris County's money bail schedule practices); *see also Pugh v. Rainwater*, 572 F.2d 1053 (5th Cir. 1978) (en banc) (condemning the jailing of indigent arrestees solely because they could not make small cash payments). Dallas County's approach to wealth-based pretrial detention procedures has also been condemned by the United States Department of Justice in a

---

[2] Dallas County's post-arrest procedures are also, for relevant constitutional purposes, materially identical to the schemes declared unlawful by numerous federal courts over the past two years in Alabama, Mississippi, Louisiana, Missouri, Tennessee, Kansas, Georgia, and California. *See Buffin v. San Franciso*, No. 15-cv-04959 (Jan. 16, 2018); *Walker v. City of Calhoun*, No. 15-CV-170, 2017 WL 2794064 (N.D. Ga. Jan. 28, 2016) (granting class-wide preliminary injunction to stop the use of money bail to detain new arrestees without an inquiry into the arrestee's ability to pay); *Rodriguez v. Providence Community Corrections, Inc.*, 155 F. Supp. 3d 758, 761 (M.D. Tenn. 2015) (granting class-wide preliminary injunction to stop the use of money bail to detain misdemeanor probationers without an inquiry into the arrestee's ability to pay); *Cooper v. City of Dothan*, No. 15-CV-425, 2015 WL 10013003, at *1–2 (M.D. Ala. 2015) (issuing Temporary Restraining Order and holding that the practice of requiring secured money bail without an inquiry into ability to pay violates the Fourteenth Amendment); *Snow v. Lambert*, No. 15-CV-567, 2015 WL 5071981, at *1–2 (M.D. La. 2015) (issuing a Temporary Restraining Order and holding that the Plaintiff was likely to succeed on the merits of her claim that Ascension Parish's money bail schedule violated due process and equal protection); *Jones ex rel. Varden v. City of Clanton*, No. 15-CV-34, 2015 WL 5387219, at *3–4 (M.D. Ala. Sept. 14, 2015) (declaring secured money bail unconstitutional without an inquiry into ability to pay); *Thompson v. City of Moss Point*, No. 15-CV-182, 2015 WL 10322003, at *1 (S.D. Miss. 2015) (same); *Pierce v. City of Velda City*, No. 15-CV-570, 2015 WL 10013006, at *3 (E.D. Mo. 2015) (issuing a declaratory judgment that the use of a secured bail schedule is unconstitutional as applied to the indigent and enjoining its operation).

recent federal court case challenging the same practices. *See* United States Department of Justice, Statement of Interest at 1, *Jones ex rel. Varden v. City of Clanton*, No. 15-CV-34, ECF No. 26(M.D. Ala. Feb. 13, 2015) (arguing on behalf of the United States government that the use of secured monetary bail schedules to keep indigent arrestees in jail "not only violates the Fourteenth Amendment's Equal Protection Clause, but also constitutes bad public policy."). Plaintiffs respectfully request that a hearing be scheduled on this motion on an expedited basis. At that hearing, Plaintiffs will present evidence establishing the following facts.

### I.     The Named Plaintiffs

At Dallas County Jail, each Plaintiff appeared before a Magistrate, in a room at the jail that is closed to the public, and the Magistrate informed them of the charges and the money bail amount required for release pursuant to the County's bail schedules. Ex. 1 ¶ 5; Ex. 2 ¶ 4; Ex. 3 ¶ 3; Ex. 4 ¶ 3; Ex. 5 ¶ 6; Ex. 6 ¶¶ 5–7. They were told by Dallas County Sheriff's Deputies not to speak at the hearing. Ex. 1 ¶ 4; Ex. 3 ¶ 3; Ex. 4 ¶ 5; Ex. 5 ¶ 5.  The hearings each lasted less than 60 seconds and, pursuant to the policies and practices described in this Complaint, no inquiry was made into any Plaintiff's ability to pay, nor was there any consideration of alternative, non-financial conditions of release. Ex. 1 ¶ 5; Ex. 2 ¶ 5; Ex. 3 ¶ 4; Ex. 4 ¶ 4; Ex. 5 ¶ 7; Ex. 6 ¶ 8.  All of the Named Plaintiffs struggle to meet the basic necessities of life, including shelter, food, medical care, and clothing.

Plaintiff Shannon Daves is a 47-year-old woman. Ex. 1 ¶ 1. Ms. Daves is currently unemployed and experiencing homelessness. *Id.* ¶ 10–11.  She was arrested on Wednesday, January 17, and taken into Dallas County custody for an alleged misdemeanor offense. *Id.* ¶ 2. She was informed that, because of the Dallas County bail schedule, she would be released immediately, but only if she paid a money bail amount of $500—an amount predetermined by the Dallas County

bail schedule. *See id.* ¶ 5.  Because she cannot afford to purchase her freedom, and because of the jail's policies relating to people who are transgender, Ms. Daves is being kept in solitary confinement 24 hours a day, segregated from the rest of the jail population. *Id.* ¶¶ 7–8. She has not been permitted to exercise, and she eats alone in her cell. *Id.* ¶ 8.

Plaintiff Shakena Walston is a 29-year-old woman. Ex. 2 ¶ 1. Ms. Walston is currently unemployed and living with her sister to avoid homelessness. *Id.* ¶¶ 6–7.  Ms. Walston was arrested on Friday, January 19, and taken into Dallas County custody for an alleged felony offense. *Id.* ¶¶ 2–3. She was informed that, because of the Dallas County bail schedule, she would be released immediately, but only if she paid a money bail amount of $15,000—an amount predetermined by the Dallas County bail schedule. *See id.* ¶ 4. Because she cannot afford to purchase her freedom, she remains in the Dallas County Jail. *Id.* ¶ 10.

Plaintiff Erriyah Banks is a 29-year-old woman. Ex. 3 ¶ 1. Ms. Banks's mother relies on her as her caretaker. *Id.* ¶ 10.  Ms. Banks was arrested on Friday, January 19, and taken into Dallas County custody for an alleged state jail felony and felony offense. *Id.* ¶ 2. She was informed that, because of the Dallas County bail schedule, she would be released immediately, but only if she paid a money bail amount of $50,000—an amount predetermined by the Dallas County bail schedule. *See id.* ¶ 3. She was told that she would be detained by Dallas County if she does not pay. *See id.* ¶¶ 3–7. Because she cannot afford to purchase her freedom, she remains in the Dallas County Jail. *Id.* ¶ 7. She has not been given the medication or special diet that she needs to treat ongoing health issues, and her mother remains without a caretaker. *Id.* ¶¶ 8, 10.

Plaintiff Destinee Tovar is a 19-year-old woman. Ex. 4 ¶ 1. Ms. Tovar is currently unemployed and without stable housing. *Id.* ¶ 6. She struggles to meet the basic necessities of life. *Id.*  Ms. Tovar was arrested on Friday, January 19, by the Mesquite Police Department for an

alleged misdemeanor. *Id.* ¶ 2. She was informed by a judge at the Mesquite jail that she would be released immediately, but only if she paid a money bail amount of $500. *Id.* ¶ 2. She could not afford to pay, so she remained in custody until she was transferred to the Dallas County Jail. *Id.* ¶ 3. At the Dallas County Jail, she saw a Magistrate Judge, who informed her that she would be released immediately, but only if she paid a bond amount of $1,500—an amount predetermined by the Dallas County bail schedule. *Id.* Because she cannot afford to purchase her freedom, she remains in the Dallas County Jail. *Id.* ¶¶ 3, 7.

Plaintiff Patroba Michieka is a 30-year-old man. Ex. 5 ¶ 1. Before his arrest, Mr. Michieka was working a few days a week and was living with his mother to avoid homelessness. *Id.* ¶¶ 9–10. He struggles to meet the basic necessities of life. *Id.* ¶ 8.  Mr. Michieka was arrested on Friday, January 19, for an alleged state-jail felony offense. *Id.* ¶ 2. He was informed that, because of the Dallas County bail schedule, he would be released immediately, but only if he paid a money bail amount of $500—an amount predetermined by the Dallas County bail schedule. *See id.* ¶ 6–7, 11. Because he cannot afford to purchase his freedom, he remains in the Dallas County Jail. *Id.* ¶ 11. He fears he may lose his job because he is unable to go to work. *Id.* ¶ 10.

Plaintiff James Thompson is a 38-year-old man. Ex. 6 ¶ 1. He is currenly unemployed and living with his parents to avoid homelessness. *Id.* ¶ 10.  Mr. Thompson was arrested on Thursday, January 18, by the Garland Police Department for two alleged state-jail felony offenses and taken to Garland's jail. *Id.* ¶ 2. He was informed by a judge there that he would be released immediately, but only if he paid a bond amount of $90,000. *Id.* ¶ 2. He could not afford to pay, so he remained in custody until he was transferred to the Dallas County Jail. *Id.* ¶ 3–4. At the Dallas County Jail, he saw a Magistrate Judge, who informed him that he would be eligible for release from Dallas County custody, but only if he paid a bond amount of $60,000—an amount predetermined by the

Dallas County bail schedule. *Id.* ¶ 7.  Because he cannot afford to purchase his freedom, he remains in the Dallas County Jail. *Id.* ¶¶ 9, 12.

## II.       Defendants' Wealth-Based System

The Dallas County Criminal Court at Law Judges ("misdemeanor Judges"), voting en banc as an administrative body, promulgated a generally applicable schedule of secured financial conditions that applies to every misdemeanor arrestee in Dallas County. The Dallas County Criminal District Court Judges ("felony Judges"), voting en banc, promulgated a generally applicable schedule of secured financial conditions that applies to every felony arrestee in Dallas County.  "Bail" means "conditions of release." The phrase "money bail" or "secured money bail" means that the person must pay their bail amount upfront in order to be released. The phrase "unsecured bail" or "unsecured bond" means that the person must promise to pay their bail amount at a later date if they do not appear for court; the person is not required to pay anything before being releases.[3]

The Judges' money bail schedules govern post-arrest procedures for all misdemeanor and felony arrestees who are booked into the Dallas County Jail (also referred to locally as "Lew Sterrett") and apply only within Dallas County.  Because the County's bail schedules require every arrestee to satisfy a secured financial condition, arrestees who can afford to pay are released after arrest upon making the payment, while those who cannot afford the amounts required are left to languish in jail cells. The County's policies and practices result in the automatic and systemic detention of impoverished individuals, who are presumptively innocent and detained solely due to

---

[3] *See* Tim Schnacke, *Fundamentals of Bail: A Resources Guide for Pretrial Practitioners and a Framework for American Pretrial Reform*, United States Department of Justice, National Institute of Corrections, 100–01 (2014), available at http://www.clebp.org/images/2014-11-05_final_bail_fundamentals_september_8,_2014.pdf ("[B]ail is best defined in terms of release, and most appropriately as a process of conditional release. . . . The purpose of bail, rather, is to effectuate and maximize release. There is 'bail'—i.e., a process of release—and there is 'no bail[]'—a process of detention.").

their inability to make a monetary payment and without any of the procedures or findings required for a valid order of pretrial detention, in violation of well-settled federal constitutional law.

### A. Arrest and transport to the Dallas County Jail

Numerous agencies within Dallas County have authority to make arrests for misdemeanor and felony offenses. If Dallas County or the City of Dallas makes the arrest, the person will be taken directly to the Dallas County Jail. If some other agency makes the arrest, the person will be taken to the local lock-up run by the arresting authority.

Some of these jurisdictions apply the Dallas County bail schedules; others apply their own local post-arrest policies. In jurisdictions that apply the Dallas County bail schedule, arrestees appear by videolink before a Defendant Dallas County Magistrate, who is located at the Dallas County Jail. The Dallas County Magistrate will refer to the County's bail schedules to determine the amount of secured money bail required for release.

Dallas County transports arrestees from local lock-ups to the Dallas County Jail. It can take two or three days for a person arrested by an agency other than Dallas County or the City of Dallas to be transported to the Dallas County Jail. On average, Dallas County books 183 people into the Dallas County Jail every day.

### B. Arraignment

Typically within a few hours of arriving at the Dallas County Jail, Sheriff's deputies assemble groups of recent arrestees—ranging from two to twenty people—to appear in-person, in the jail, before a defendant Magistrate for a legal proceeding referred to as "arraignment." These hearings were closed to the public. No defense attorney or prosecutor is present at the hearing.

Before an arraignment docket begins, Sheriff's deputies tell arrestees not to speak, and not to ask questions unless the Magistrate gives them permission. Some deputies also tell arrestees

that the Magistrate will increase the money bail amount required for release if they say anything during the hearing. At the "arraignments," Magistrates call each arrestee individually by name, and inform her of the offense charged—but not the allegations underlying the charge—and the monetary payment required by the Dallas County bail schedule for release. The process of setting bail is a rote exercise.

### C.  The bail schedules

The misdemeanor and felony bail schedules are the exclusive means for determining conditions of pretrial release for arrestees who are taken to Lew Sterrett. Magistrates impose secured financial conditions of release, in the amount listed in the bail schedule, in almost every case.

Magistrates do not consider an arrestee's ability to pay when determining conditions of release in any case. In fact, Magistrates *cannot* consider ability to pay because they have no financial information about the arrestees who appear before them; they make no inquiry into arrestees' ability to pay any particular money bail amount; and arrestees are told that they may not speak during the hearings at which Magistrates determine conditions of release. Neither the Magistrates nor any other government official consider alternatives to secured financial conditions of release, or make findings that a secured financial condition is necessary to meet any government interest. In addition to making no affirmative inquiry into or findings concerning ability to pay, Magistrates affirmatively refuse to hear any argument from an arrestee who is bold enough to raise her inability to pay. If an arrestee does ask for a lower money bail amount or for release on non-financial conditions, as a matter of policy and practice, the Magistrate refuses to change the money bail amount required by the schedule and tells the person to speak with her lawyer. (Indigent arrestees do not yet have a lawyer.) Magistrates refuse to reduce money bail amounts or grant

9

release on unsecured bail or non-financial conditions, even when the Magistrate knows or should know that the person will be detained as a result of a secured financial condition of release. Magistrates do not make any findings, on the record or otherwise, about the appropriateness of the conditions of release they require or alternative conditions of release in light of any government interest. Magistrates also do not make any findings concerning the arrestee's ability to pay money bail, or the reasons for the specific amount of money bail required for release.  Each person's entire hearing for determining the conditions of release—or resulting in de facto money-based orders of pretrial detention—lasts about 60 seconds or less.

The Magistrates are agents of the Defendant Judges. They are hired and fired by the Defendant Judges and can exercise only whatever authority and discretion the Judges afford them.[4] The Defendant Judges know that the Magistrates require secured financial conditions of release in every case, according to the Judges' bail schedules. They know that the Magistrates fail or refuse to conduct an inquiry into ability to pay, consider alternative conditions of release, or make findings concerning the need for pretrial detention to meet a compelling government interest. The Judges have the power to require the Magistrates to follow the law but instead acquiesce in the Magistrates' custom of requiring secured financial conditions in every case without an inquiry or findings concerning ability to pay or alternative conditions of release.

### D.  The moment of differential treatment

---

[4] Tex. Gov't Code Ann. § 54.301(a) (authorizing the Judges of the District Courts and County Criminal Courts to "appoint a magistrate to perform the duties authorized by this subsection."); Tex. Gov't Code Ann. § 54.401(c) ("If a magistrate serves more than one court, the magistrate's appointment must be made with the unanimous approval of all the judges under whom the magistrate serves."); Tex. Gov't Code Ann. § 54.875(b) ("The services of a magistrate who serves more than one court may be terminated by a majority vote of all the judges whom the magistrate serves."); *Davis v. State*, 956 S.W.2d 555, 559 (Tex. Crim. App. 1997) ("However, a magistrate is not a judge in his own right and acts as a surrogate of the duly elected judge. . . ."); *Gambling Paraphernalia, Devices, Equipment, & Proceeds v. State*, 22 S.W.3d 625, 627 (Tex. App.—Dall. 2000, no pet.) ("[The Magistrate] acts as an agent of the district courts and has no authority of his own.").

Once an arrestee knows the money bail amount required for release, she can pay the sum and go home. If she cannot afford the payment, Dallas County will keep her in jail. The moment that secured money bail is required for release is the moment of differential treatment.

After each arraignment docket, Sheriff's deputies ask arrestees whether they can afford the amount required for release. Arrestees who were booked into the jail with sufficient cash on hand are taken to a "vault" in the jail to retrieve their money and pay for release. Arrestees who can afford the money bail amount but do not have cash on hand are escorted to an ATM machine in the booking area of the jail. If the arrestee has sufficient funds in a personal bank account, she can withdraw the money and purchase release. Arrestees who cannot afford the full payment can make phone calls to friends or family to pay the monetary amount, or they can contact a for-profit bonding company to seek assistance in making the payment. Arrestees who cannot afford the payment, or even the 10% typically required by bonding companies, will be assigned to a housing unit and confined to a jail cell. Thus, for arrestees who cannot afford money bail, the secured financial condition of release operates as a de facto order of pretrial detention, even though Defendants do not provide the findings or procedures that the Constitution requires to justify an order of pretrial detention.

The Sheriff knows that secured financial conditions of release, required without an inquiry and findings, result in the post-arrest detention of hundreds of presumptively innocent arrestees every week, and thousands every month. The Sheriff has discretion, under state law, to refuse to enforce unlawful orders. But, by policy and practice, the Sheriff's Department chooses to enforce secured money bail amounts that operate as de facto orders of pretrial detention, even though she also knows they were entered without any of the procedures and findings required for a valid order. Each Judge knows that the Sheriff enforces illegal orders of pretrial detention against thousands

of individuals every day, who are detained in the jail solely because they are too poor to pay the money bail amounts required pursuant to the bail schedules they promulgated.

In this way, the Magistrates' custom of requiring secured money bail as a condition of release in every case, the Judges' acquiescence in this custom, and the Sheriff's policy of enforcing unconstitutional orders conditioning release on a monetary payment causes systemic and automatic wealth-based detention in Dallas County.

### E.    The DA's decision to file charges

Immediately after arraignment, Sheriff's deputies distribute a form that impoverished arrestees can use to request appointed counsel and assign the arrestees who cannot afford their release to a housing unit. As a matter of policy and practice, if an arrestee is in jail because she has not paid a monetary bail amount, Judges and their court coordinators presume that the individual is indigent and assign the individual appointed counsel.[5]

Impoverished arrestees must continue to wait in jail while the DA's Office decides whether to file charges. The misdemeanor Judges allow the DA's Office four business days (to decide whether to file a misdemeanor case, and the felony Judges allow the DA's Office five business days to file most felony cases, and ten business days file more serious felony cases. The felony Judges also allow the DA's Office up to thirty days to file the most serious felony cases.

As a result of these policies, indigent arrestees who cannot afford money bail are routinely kept in jail cells for a week (if charged with a misdemeanor) and more than two weeks (if charged with a felony), before an ADA even files a charge. This time period will be longer if there is an

---

[5] Court coordinators do not inform arrestees when an attorney has been appointed, much less provide arrestees with the name and contact information for the attorney. It is effectively impossible for an arrestee to know who her lawyer will be or to contact her lawyer until the arrestee meets the lawyers, typically at first appearance after the DA's Office has filed charges.

intervening holiday. The total time period that a person is detained before charges are filed will also be longer if the person was arrested by an agency other than the City of Dallas or Dallas County.[6]

In felony cases, after the DA's Office files charges, arrestees are entitled to indictment by a grand jury. But because of backlogs at the grand jury, it can take two to three *months* for the indictment process to conclude. Due to these backlogs, felony arrestees—especially those charged with low-level felony offenses—routinely waive indictment so that they can be brought to court as soon as the ADA files charges.

It is impossible, in practice, to raise ability to pay or challenge conditions of release prior to a case being filed. In fact, the Presiding Judge of the misdemeanor courts referred to the four-to-ten-day period before a misdemeanor case is filed as a "black hole": during this time, nothing can happen in the case, and impoverished arrestees are left to languish in jail. Some Judges even claim that they lack jurisdiction to hear bond reduction motions before a case is filed. Even when a defense attorney files a bond-reduction motion prior to a case being filed, the hearing will typically be set for days or a week in the future. During this entire period of time, the arrestee will be kept in jail due to her inability to pay money bail.

---

[6] Some impoverished arrestees, after being subjected to days or weeks of wealth-based detention but before the ADA makes a charging decision, manage to scrape together enough money from family and friends to pay a for-profit bonding company a non-refundable fee of hundreds, or thousands, of dollars to secure release from jail. Even if the ADA decides not to pursue the case, that person will never get her money back.

### F.      First appearance

First appearance is not an adequate opportunity to raise ability to pay or challenge conditions of release. Instead, the Judges' policies concerning first appearance ensure that a guilty plea is the fastest way for an impoverished arrestee to secure freedom.

In fact, one of the purposes and effects of Dallas County's post-arrest money-based detention scheme is to coerce and process large numbers of guilty pleas prior to any person conducting any legal or factual investigation into the charges, let alone the complete and zealous investigation and defense required by professional standards and the Sixth Amendment to the United States Constitution. Most misdemeanor and low-level felony arrestees who plead guilty at first appearance accept a sentence of time-served and are released from jail that day. Others who plead guilty at first appearance but are not released that day accept sentences that nonetheless result in their release well before any subsequent court appearance would occur.

Judges instruct court coordinators not to schedule arrestees' first appearances until after a case has been filed and (if applicable and not waived) an indictment has issued. As a result of the filing deadlines Judges have implemented for the DA's Office, first appearances for misdemeanor arrestees nearly always occur between four and ten days after arrest; first appearances for felony arrestees who waive indictment between two and three weeks after arrest; and first appearances for felony arrestees who do not waive indictment between two and three months after arrest.

On the day of an arrestee's first appearance, officers and employees of the Sheriff's Department will transport the arrestee from the jail to the "lock-up"—which is a holding cell that is connected to, but outside of, the courtroom—on the so-called "jail chain." "Jail chain" is the term used to refer to the group of impoverished detained arrestees who are brought to court, shackled with metal chains, for their first appearance. In theory, first appearance is the first

14

opportunity an arrestee who cannot afford to purchase her release has to speak to a Judge or make any challenges to the conditions of release required by the Magistrate at "arraignment." But, as a matter of policy and practice, there is no meaningful review of the money bail amount previously imposed pursuant to the schedule. Instead, arrestees are kept in the lock-up, and are not brought into the courtroom to see the Judge unless they have agreed to plead guilty. If an arrestee agrees to plead guilty at first appearance, she will be brought into the courtroom to enter the plea. Most misdemeanor and low-level felony arrestees who are detained at first appearance plead guilty, accept sentences of time-served, and are released from jail that day.

Although requesting a bail reduction or seeking release on a personal bond is a theoretical possibility at the first appearance, it almost never happens. Instead, judges set hearings on bail reduction motions for about a week in the future as a matter of policy. Defense attorneys must ask the judge to break with custom to hear any matters at first appearance related to arrestees who are not pleading guilty. Judges very rarely grant bond reductions or permit release without requiring secured money bail. Even when Judges finally consider bail reduction motions, the Judge refuses to consider ability to pay, basing the decision instead on other factors, such as the person's criminal history or current charge. Due to these policies and practices, for people who cannot afford money bail, a guilty plea at first appearance is typically the fastest way out of jail. Because of the foregoing policies and practices, first appearance is not an adequate opportunity to raise ability to pay or challenge conditions of release.

If an arrestee does not plead guilty at the first appearance, she will be taken back to the Dallas County Jail where she will be kept in a jail cell until her next appearance. It can take weeks or months for a subsequent appearance.

### III.   Arrestees who cannot afford to pay secured money bail will be detained in the Dallas County Jail for days or weeks due to their inability to pay

In Dallas County, there are four types of bonds an arrestee can post to secure release from jail after arrest and before disposition: cash bonds, surety bonds, pretrial-release bonds, and personal bonds (also referred to as "personal recognizance bonds"). Each of these mechanisms of release requires either an upfront monetary payment or lengthy periods of wealth-based detention. For example, a person released on a "surety bond," which requires the person to contract with a for-profit bonding company, must typically pay l0% of the full amount and wait an average of four days in jail prior to release. Pretrial-release bonds require an upfront payment of $20 or 3% of the total bond amount, unless the Director of Pretrial Services decides to waive the fee. However, due to County policy, the vast majority of arrestees—including all arrestees who are experiencing homelessness—are ineligible for release on pretrial-release bonds. Individuals who are released on pretrial-release bonds are kept in jail an average of three days before being released. A Judge can also grant an arrestee a "personal recognizance bond," which require no upfront payment. People released on these bonds spend an average of three weeks in jail due to their inability to pay the money bail amount required by the County's bail schedule.

## IV.  Detention in the Dallas County Jail Causes Serious and Irreparable Harm

The Dallas County Jail is one of the largest jails in Texas. In 2016, the jail booked 67,122 people total: an average of 5,594 people every month, and 183 people every day.[7] On any given day, the vast majority of people in Dallas County Jail cells—around 70%—are presumptively innocent people who are there because they cannot afford to make a monetary payment.

---

[7] Jail Population Committee Meeting at 23 (Apr. 14, 2017), available at
https://www.dallascounty.org/Assets/uploads/docs/criminal-justice/jail-pop/2017/2017%20-%2003.pdf.

As of December 2017, one-third of the Dallas County Jail population had an identified mental illness.[8] Between January 2012 and the present, 21 people died while in pretrial custody in the Dallas County Jail. There is a documented history of inmate abuse by jail guards, deaths and suicides in the jail,[9] inadequate training of jail staff, and lack of access to medications and medical services. For years, the County has been aware of these intolerable conditions, but it has failed to remedy them.[10]

## V.    Alternatives to Dallas County's Wealth-Based Post-Arrest System are Readily Available

Empirical evidence does not show any relationship between monetary conditions of release and arrestees' rates of appearance in court.[11] In contrast to Dallas County, many American

---

[8] Naomi Martin, *'Badley Needed': Dallas First Responders Laud New Ways to Help Mentally Ill in 2017*, Dall. Morning News, Dec. 19, 2016, available at https://www.dallasnews.com/news/dallas-county/2016/12/19/jail-er-first-responders-ways-handle-dallas-mentally-2017.

[9] An analysis of the Texas Attorney General's Custodial Death Report revealed that at least 20 people died while in pretrial custody at the Dallas County Jail between January 1, 2012, and November 19, 2017. *See* Custodial Deaths Report, available at https://oagtx.force.com/cdr/cdrreportdeaths, and Dallas County Felony and Misdemeanor Courts Case Information, available at https://www.dallascounty.org/criminalBackgroundSearch/captcha. *See also* Cary Aspinwall & Stephanie Lamm, *Unresponsive: Women are Going to Jail in Need of Drug and Alcohol Treatment. Help Often Comes Too Late*, Dall. Morning News, Dec. 17, 2017, available at https://interactives.dallasnews.com/2017/unresponsive/; Naomi Martin, *Brutal Killing Inside Dallas County Jail Leaves Experts Asking Whether It Could Have Been Prevented*, Dall. Morning News, Jan. 7, 2017, available at https://www.dallasnews.com/news/dallas-county/2017/01/07/brutal-killing-inside-dallas-county-jail-leaves-experts-asking-whether-prevented.

[10] J.D. Miles, *Caught On Video: Inmate Claims Abuse At Dallas County Jail*, CBS DGW, May 14, 2013, available at http://dfw.cbslocal.com/2013/05/14/caught-on-video-inmate-claims-abuse-at-dallas-county-jail/; Kevin Krause, *Dallas County Doesn't Want to Defend Jail Guards Accused of Causing Inmate's Death*, Dall. Morning News, May 5, 2010, available at https://www.dallasnews.com/news/crime/2010/05/04/dallas-county-doesnt-want-to-d; Kevin Krause, *UPDATE: Dallas County Jail Guard Arrested for Having Sex With An Inmate*, Dall. Morning News, July 23, 2009, available at https://www.dallasnews.com/news/crime/2009/07/23/dallas-county-jail-guard-arres-1; Kevin Krause, *Former Dallas County Jail Guard Alleges Abuse in the Slammer in Tell-All Book*, Dall. Morning News, Dec. 16, 2009, available at https://www.dallasnews.com/news/crime/2009/12/16/former-dallas-county-jail-guar; Diane Jennings, *Dallas County Detention Officer Accused of Sexually Abusing Inmate*, Dall. Morning News, Apr. 2, 2013, available at https://www.dallasnews.com/news/crime/2013/04/02/dallas-county-detention-officer-arrested-for-abusing-an-inmate; Kevin Krause, Dallas County Jail Guard Admits Inmate Danced for Her, Dec. 31, 2009, available at https://www.dallasnews.com/news/news/2009/12/31/20091230-Dallas-County-Jail-guard-admits-inmate-8227.

[11] *See e,g.*, Arpit Gupta et al., *The Heavy Costs of High Bail: Evidence from Judge Randomization* 5 (2016), available at http://www.columbia.edu/~cjh2182/ GuptaHansmanFrenchman.pdf ("We find no evidence that money bail increases the probability of appearance."); Michael Jones, *Unsecured Bonds: The As Effective and Most Efficient Pretrial Release Option* 3 (2013), available at http://www.pretrial.org/download/research/ Unsecured+Bonds,+The+As+Effective+and+Most+Efficient+Pretrial+Release+Option+-+Jones+2013.pdf ("Higher

jurisdictions do not keep people in jail on minor offenses because of their poverty. Instead, many

other jurisdictions release arrestees with an unsecured bond, on their own recognizance, or with

tailored non-financial conditions of release, such as required check-ins with a supervising officer,

reasonable and periodic drug testing, treatment for mental health issues, housing and employment

assistance appointments, unsecured bond, text message and phone call reminders, curfew, or, in

certain extreme cases involving a person who is a demonstrable flight risk or danger to the

community, electronic monitoring. In jurisdictions where arrestees are released on unsecured

bond, the person promises to pay the scheduled amount of money if the person fails to appear in

court. When a person is released on her own recognizance, she promises to appear for court,

usually on penalty of an additional criminal charge for failing to appear. In many places, each of

these options is supplemented by the person's agreement to other reasonable conditions of release.

The vast majority—upwards of 90 percent—of people released on alternatives to financial

conditions remain crime-free and make all of their court appearances. In none of these situations

is a person kept in a jail cell solely because she cannot afford a sum of money. In short, many

courts function in a way that both promotes public safety and ensures the fundamental

constitutional right to liberty prior to trial.

## **ARGUMENT**

### I.      **Introduction**

"In our society liberty is the norm, and detention prior to trial … is the carefully limited

exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). Dallas County, however, detains

tens of thousands of arrestees for days or weeks after arrest solely because they cannot pay money

---

monetary amounts of secured bonds are associated with more pretrial jail bed use but not increased court apperance
rates.").

18

bail. This systemic and automatic detention of impoverished people, all of whom are presumed innocent, is not an "exception," let alone a "carefully limited" one.

Plaintiffs' constitutional claims have "both substantive and procedural aspects." *Washington v. Harper*, 494 U.S. 210, 220 (1990). Substantively, Plaintiffs' claims flow from two lines of precedent.[12] First, equal protection and due process forbid jailing a person solely because of her inability to make a payment. *Bearden v. Georgia*, 461 U.S. 600 (1983); *Pugh*, 572 F.2d 1053. Second, due process protects a right to pretrial liberty that is "fundamental." *Salerno*, 481 U.S. at 750; *see also Foucha v. Louisiana*, 504 U.S. 71, 80 (1992) ("Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action.") (citing *Youngberg v. Romeo*, 457 U.S. 307, 316 (1982)); *Lopez-Valenzuela v. Arpaio*, 770 F.3d 772, 780 (9th Cir. 2014) (en banc) (applying strict scrutiny to Arizona bail law because it infringes on the "fundamental" right to pretrial liberty). Procedurally, the Constitution requires the government to provide certain safeguards to guard against the erroneous deprivation of these substantive rights. *Washington*, 494 U.S. at 228.

The two substantive constitutional rights at issue in this case—the right against wealth-based detention and the fundamental right to pretrial liberty—cannot be infringed unless the government satisfies strict scrutiny. The government must take multiple steps to ensure that pretrial detention is narrowly tailored to a compelling state interest. First, before requiring a person to make a monetary payment in exchange for release, the government must inquire into and make findings concerning the person's ability to pay. If the person cannot pay the amount required, such that the condition of release will instead function as a de facto detention order, then further procedures are required.

---

[12] This Motion for Preliminary Injunction is filed with respect to both Counts I and II of the Complaint.

Before requiring a person to pay an amount of money she cannot afford, a judicial officer must make the substantive findings and provide the procedural safeguards required for issuing a transparent order of detention. These safeguards include: (1) a substantive finding that pretrial detention is necessary because no alternative conditions or combination of conditions short of complete pretrial incapacitation can serve a compelling government interest; and (2) robust procedural safeguards, including, at a minimum: an adversarial hearing with counsel; notice of the critical issues to be decided at the hearing; an opportunity to be heard, to present evidence, and to confront evidence; application of a specific heightened burden of proof; and findings on the record. *Salerno*, 481 U.S. at 750.

Defendants are currently evading the substantive findings and procedural protections required for lawful pretrial detention by using secured financial conditions of release to accomplish de facto detention in every case in which a person happens to be too poor to pay the predetermined monetary amounts written in the Dallas County schedule. These policies and practices violate equal protection and due process, and they result in the illegal pretrial detention of tens of thousands of presumptively innocent people every year in Dallas County.

## II.   Dallas County's Wealth-Based Bail Practices Violate Plaintiffs' Substantive Constitutional Rights Against Wealth-Based Detention and to Pretrial Liberty

### A. The Equal Protection and Due Process Clauses Protect the Substantive Right Against Wealth-Based Detention

The constitutional principle at issue is straightforward: A person may not be "subjected to imprisonment solely because of his indigency." *Tate v. Short*, 401 U.S. 395, 397–98 (1971). This principle has led the Supreme Court to strike down state and local practices jailing individuals solely due to their inability to pay a fine on three occasions—in *Tate*, *Williams v. Illinois*, 399 U.S. 235 (1970), and *Bearden*, 461 U.S. 660. In the last of these cases, the Court reiterated the core

principle on which this substantive right rests: the "impermissibility of imprisoning a defendant solely because of his lack of financial resources." *Id.* at 661.

The Court has explained that these cases are exceptional because they "reflect both equal protection and due process concerns," *M.L.B. v. S.L.J.*, 519 U.S. 102, 120 (1996), and it has cautioned against attempts to resolve similar cases "by resort to easy slogans or pigeonhole analysis." *Bearden*, 461 U.S. at 666. Accordingly, such cases are not limited by the ordinary equal protection rule excluding disparate-impact liability. *See M.L.B.*, 519 U.S. at 125–27; *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 20–21 (1973); *see also Frazier v. Jordan*, 457 F.2d 726, 728 (5th Cir. 1972).

The principles animating the Court's holdings in *Tate*, *Williams*, and *Bearden* apply with greater force in the pretrial context, where the person detained due to inability to make a monetary payment is presumed innocent. *Pugh v. Rainwater* applied the Supreme Court's ban on wealth-based detention to the bail context forty years ago: "At the outset we accept the principle that imprisonment solely because of indigent status is invidious discrimination and not constitutionally permissible." 572 F.2d at 1056. In *Pugh*, a plaintiff class challenged Florida's secured-bail system, seeking a presumption that secured bail was unconstitutional for indigent arrestees. *Id.* at 1055–56. The court began its analysis by citing *Williams* and *Tate* for "the principle that imprisonment solely because of indigent status is invidious discrimination and not constitutionally permissible." *Id.* at 1056. If the Constitution prohibits wealth-based detention for those convicted of crimes, the Fifth Circuit reasoned, that principle has "broader . . . implications" for those "accused but not convicted of crime." *Id.* The *Pugh* court accordingly had "no doubt" about the propriety of applying the principle against wealth-based detention "in the case of an

indigent [suffering] pretrial confinement for inability to post money bail." *Id.* at 1058.[13] Applying *Pugh* and the *Bearden* line of cases, Chief Judge Rosenthal of the Southern District of Texas recently struck down a post-arrest system that violated the Constitution in all of the same ways as Dallas County's system. *See ODonnell*, 251 F. Supp. 3d at 1134–37. In many ways, Dallas's system is even worse: Dallas County's legal proceedings for determining conditions of release are closed to the public (they are accessible to the public in Harris County); arrestees routinely wait four to ten days to be taken to court if charged with a misdemeanor (in Harris County, misdemeanor arrestees are generally taken to court within four days of arrest), and two weeks if charged with a felony (assuming the arrestee waives indictment); and arrestees in Dallas County who are eventually released on unsecured bond wait an average of three weeks (Harris County generally processes personal bonds within a few days or a week of arrest). If Harris County's system violates the Constitution, Dallas County's surely does, too.

As *ODonnell* recognizes, unattainable money bail that results in a person's pretrial detention may be constitutionally permissible in some cases. *Id.* at 1152 ("Once deemed eligible for release, indigent misdemeanor defendants who cannot pay the secured financial condition of release cannot be detained on that basis without a hearing and judicial findings on the record that no other reasonable alternative is available."). But such a detention order is subject to strict scrutiny and requires consideration of alternatives to money bail and a finding that no less restrictive conditions of release would serve a specific government interest. The Court in *Bearden*, for example, in examining the constitutionality of revoking probation due to inability to pay a fine,

---

[13] Because Plaintiffs' claim in *Pugh* was mooted when the Florida Supreme Court formally promulgated new bail rules while *Pugh* was pending, the court in *Pugh* resolved the appeal without granting the requested relief. 572 F.2d at 1055–56 & n.1, 1058. As to the new rules, the court declined to presume that Florida courts would continue the "automatic setting of money bails" and "constitutionally interdicted pretrial detention of indigents [that] will be the inevitable result." *Id.* at 1058. Any constitutional challenge to the new bail rules, the court therefore held, must "await . . . a proper record reflecting application by [Florida] courts." *Id.* at 1058–59.

made "careful inquiry" into the state's professed interests and "the existence of alternative means for effectuating" those interests. 461 U.S. at 666–67. In *Frazier*, the Fifth Circuit applied strict scrutiny to hold that a judicial order, requiring an indigent person convicted of violating a local noise ordinance to either pay a fine or spend several weeks in jail, violated equal protection and due process because the alternative jail term was not "'necessary to promote a compelling government interest.'" 457 F.2d at 728 (quoting *Shapiro v. Thompson*, 394 U.S. 618, 634 (1969)). The court found that there were "far less onerous alternatives" that would satisfy the "state's interest in collecting its fine revenue." *Id.* at 728; *see id.* at 729–30 (reviewing adequate alternatives available to the state). Given the availability of adequate alternatives, "however compelling the state's interest in collecting its fines," *id.* at 728–29, "[i]mprisonment of those who cannot pay their fines immediately is not necessary to promote the state's compelling interests in effective punishment and deterrence of crime," *id.* at 730. The *Pugh* court also held that the Constitution requires "meaningful consideration of . . . alternatives" to "incarceration of those who cannot" pay a financial condition of release, and an individualized finding that secured money bail "is necessary to reasonably assure defendant's presence at trial." 572 F.2d at 1057. Accordingly, if the government's interest in "appearance at trial could reasonably be assured by … alternate [conditions] of release, pretrial confinement for inability to post money bail" is unconstitutional. *Id.* at 1058; *see also* Order at 14, *Buffin v. San Francisco*, No. 15-CV-04959, ECF No. 191 (N.D. Cal. Jan. 16, 2018) (holding that "an examination of the *Bearden-Tate-Williams* line of cases persuades the Court that strict scrutiny applies to plaintiffs' Due Process and Equal Protection claims.").[14]

---

[14] *Pugh* does not explicitly discuss whether strict or intermediate scrutiny applies. But *Frazier*, which remains binding, explicitly applied strict scrutiny, 457 F.2d at 728, consistent with *Bearden*'s later rejection of a challenged practice because the government's interest could "often be served by alternative means," 461 U.S. at 671–72. In any event,

Over the past several years, federal and state courts across the country have applied *Pugh* and the *Bearden* line of cases to condemn the practice of requiring the payment of money bail without first determining whether the arrestee has the ability to pay. *See, e.g.*, *ODonnell*, 251 F. Supp. 3d at 1059 (enjoining Harris County from detaining misdemeanor arrestees who are otherwise eligible for release but are unable, because of their poverty, to pay a secured money bail); *id.* at 1161–65 (requiring Harris County to conduct an inquiry into ability to pay and to "explain to arrestees the nature and significance of the" financial information collected); *Walker*, 2017 WL 2794064, at *4 (enjoining the City from detaining indigent misdemeanor arrestees due to their poverty and requiring the City to release arrestees who cannot afford secured money bail on unsecured bail or their own recognizance); *Rodriguez*, 155 F. Supp. 3d at 768–69 (M.D. Tenn. Dec. 17, 2015) (enjoining a policy of detaining misdemeanor probationers who could not pay a predetermined amount of bail); Order at 4, 5, *Burks v. Scott Cnty.*, No. 3:14-CV-745, ECF. No. 108 (S.D. Miss. June 26, 2017) (order entering declaratory relief) (holding that "an arrestee's right to pretrial liberty is fundamental" and "an arrestee is entitled to an individualized bail hearing wherein courts must meaningfully consider alteranatives other than money bail in determining how best to assure a defendant's presence at trial"). As in each of these cases, Defendants in this lawsuit violate Plaintiffs' right against wealth-based detention by jailing them due solely to their inability to make a monetary payment, without an inquiry into ability to pay, without consideration of alternatives, and without findings regarding the necessity of pretrial detention.

**B.  The Supreme Court in *Salerno* recognized the substantive due process right against deprivations of pretrial liberty**

---

this Court need not resolve what scrutiny applies because, as in *ODonnell,* the Dallas County system clearly flunks intermediate scrutiny. *See infra*.

Pretrial detention of a presumptively innocent person due to her inability to make a monetary payment implicates a second substantive right: the "fundamental" right to pretrial liberty. *Salerno*, 481 U.S. at 750; *see also Zadvydas v. Davis*, 533 U.S. 678, 690 (2001) ("Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects."); *Foucha*, 504 U.S. at 80; *Lopez-Valenzuela*, 770 F.3d at 781.

Because the "interest in liberty" is "fundamental," it is a "'general rule' of substantive due process that the government may not detain a person prior to a judgment of guilt in a criminal trial." *Salerno*, 481 U.S. at 750. Like other fundamental rights, however, the government cannot deprive anyone of the right to pretrial liberty without satisfying strict scrutiny—as the Court explained in *Salerno*, which upheld the 1984 Bail Reform Act against a facial challenge. 481 U.S. at 746–51. The government must demonstrate that the deprivation is narrowly tailored to achieve a compelling interest. *See Lopez-Valenzuela*, 770 F.3d at 780–81 (compiling "Supreme Court decisions, which have confirmed that *Salerno* involved a fundamental liberty interest," and applying strict scrutiny); *see also Salerno*, 481 U.S. at 749, 751 (describing the government interest in preventing serious pretrial crime as "compelling" and the statute as "careful[ly] delineat[ing] . . . the circumstances under which detention will be permitted"). That is, the government must demonstrate that its "infringement [of pretrial liberty] is narrowly tailored to serve a compelling state interest." *Lopez-Valenzuela*, 770 F.3d at 780.

Following *Salerno*, courts across the country have applied the Supreme Court's reasoning to protect the substantive right to pretrial liberty. *See Lopez-Valenzuela*, 770 F.3d at 780 (applying heightened scrutiny to Arizona bail law because in infringes on the "fundamental" right to pretrial liberty); *ODonnell*, 251 F. Supp. 3d at 1143 (finding that release from custody before trial

"implicates fundamental constitutional guarantees: the presumption of innocence and the right to prepare for trial"); Order at 10–11, *Buffin v. San Francisco*, No. 15-CV-04959, ECF No. 191 (holding that the government must satisfy strict scrutiny before requiring a secured financial condition of release because pretrial detention due to inability to pay "implicates plaintiffs' fundamental right to liberty"); *see also, e.g.*, *Carlisle v. Desoto Cty.*, No. 09-CV-212, 2010 WL 3894114, at *5 (N.D. Miss. Sept. 30, 2010) (holding that because a "compelling state interest" was required for pretrial detention, the plaintiff's rights were violated if he was jailed without a consideration of non-financial alternatives); *Williams v. Farrior*, 626 F. Supp. 983, 986 (S.D. Miss. 1986) (holding that a state's pretrial detention scheme must meet "strict judicial scrutiny" because of the fundamental rights at issue); *Simpson v. Miller*, 387 P.3d 1270, 1276 (Ariz. 2017) ("[I]t is clear from *Salerno* and other decisions that the constitutionality of a pretrial detention scheme turns on whether particular procedures satisfy substantive due process standards."). Most recently, the highest court of Massachusetts held that strict scrutiny must apply to any government action that infringes the "fundamental right to liberty." *Brangan v. Commonwealth*, 80 N.E.3d 949, 954 (Mass. 2017).[15]

### C. Defendants' Requirement of an Unattainable Financial Condition of Release Is the Functional Equivalent of Ordering Pretrial Detention

Federal courts have unanimously held that monetary conditions of "release" that result in detention are equivalent to orders of detention and, therefore, must meet the exacting procedural and substantive requirements for orders of detention. *See, e.g.*, *United States v. Mantecon-Zayas*,

---

[15] Bodily liberty is the most obvious, but not the only, "fundamental constitutional guarantee[]," *ODonnell*, 251 F. Supp. 3d at 1143, that is implicated by Dallas County's post-arrest, wealth-based detention policies. Pretrial detention also infringes on the presumption of innocence and the right to a fair trial. *Pugh*, 557 F.2d at 1197; *ODonnell*, 251 F. Supp. 3d at 1143. As the Supreme Court explained in in 1951: "This traditional right to freedom before conviction permits the unhampered preparation of a defense, and serves to prevent the infliction of punishment before conviction. Unless this right to bail before trial is preserved, the presumption of innocence, secured only after centuries of struggle, would lose its meaning." *Stack v. Boyle*, 342 U.S. 1, 4 (1951). Strict scrutiny must be applied to any scheme that infringes these fundamental rights. *Pugh*, 557 F.2d at 1197.

949 F.2d 548, 550–51 (1st Cir. 1991) ("[O]nce a court finds itself in this situation—insisting on terms in a "release" order that will cause the defendant to be detained pending trial—it must satisfy the procedural requirements for a valid detention order . . . ."); *United States v. Leathers*, 412 F.2d 169, 171 (D.C. Cir. 1969) ("[T]he setting of bond unreachable because of its amount would be tantamount to setting no conditions at all."); *United States v. McConnell*, 842 F.2d 105, 110 (5th Cir. 1988) ("When no attainable conditions of release can be put into place, the defendant must be detained pending trial. In such an instance, the court must explain its reasons for concluding that the particular financial requirement is a necessary part of the conditions for release."); *ODonnell*, 251 F. Supp. 3d at 1156 (holding that secured money bail set in an amount that an arrestee cannot afford is constitutionally equivalent to an order of detention); *United States v. LeClercq*, No. 07-80050-CR, 2007 WL 4365601, at *3 (S.D. Fla. Dec. 13, 2007) ("If after being advised by a defendant that she cannot meet the financial conditions imposed by a release order the district court nonetheless determines that the bail is reasonably necessary to ensure the defendant's presence at trial, *the district court can proceed to make the requisite findings and issue a detention order*."); *see also Brangan*, 80 N.E.3d at 963 ("[W]here a judge sets bail in an amount so far beyond a defendant's ability to pay that it is likely to result in long-term pretrial detention, it is the functional equivalent of an order for pretrial detention, and the judge's decision must be evaluated in light of the same due process requirements applicable to such a deprivation of liberty.");[16] *State v. Brown*,

---

[16] *Brangan* first decided that unattainable money bail is not *per se* unconstitutional before holding that, if money bail is unaffordable, it must be treated as the equivalent of an order of pretrial detention. The first of those holdings is likely incorrect as a matter of history, logic, and law. *See* Brief for *Amicus Curiae* Cato Institute at 2–12, *Walker v. City of Calhoun*, No. 16-10521 (11th Cir. 2016), available at https://object.cato.org/files/pubs/pdf/walker-v-city-of-calhoun.pdf (explaining that, throughout the history of bail, since the Magna Carta, bail has been a mechanism of release, and any financial condition of bail had to be imposed in an amount that the presumptively innocent person could pay). To put it simply, for centuries, money bail was required to be set in an amount that actually accomplished its purpose: release. To require a financial condition of release that results in detention is a logical impossibility—it can never produce the incentive that it is theoretically designed to create because the person is never in a position in which that incentive can operate. In any event, this motion raises a far

338 P.3d 1276, 1292 (N.M. 2014) ("Intentionally setting bail so high as to be unattainable is simply a less honest method of unlawfully denying bail altogether.").

Here, the Defendants required a secured financial condition of release without any inquiry into whether Plaintiffs could pay it. For the Plaintiffs—who are struggling to find work and stable housing—the money bail amounts required for their release are impossible for them to attain. Complaint, ECF No. 1, Exs. 1-6. Setting an impossible condition of release is the functional equivalent of setting no conditions of release at all. It is effectively an order of pretrial detention.

### D.  A Valid Order of Pretrial Detention Requires the Government to Comply with Rigorous Procedures and Make Specific On-the-Record Findings about the Need for Preventive Detention of a Presumptively Innocent Person

Analysis under the Due Process Clause "proceeds in two steps: We first ask whether there exists a liberty or property interest of which a person has been deprived, and if so we ask whether the procedures followed by the State were constitutionally sufficient." *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (citing *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989)). Plaintiffs satisfy the first step because, as explained above, Plaintiffs have been deprived of two liberty interests: the right against wealth-based detention and the "fundamental" "interest in [pretrial] liberty." *Salerno*, 481 U.S. at 750.

The second step of the procedural due process analysis—determining the procedures required for a valid pretrial detention order—proceeds under the *Mathews v. Eldridge* three-part balancing test, in which a court must consider (1) "the private interest" at issue, (2) "the risk of an erroneous deprivation" absent the sought-after procedural protection, and (3) the state's interest in not providing the additional procedure. 424 U.S. 319, 334–35 (1976). The balancing of the

---

simpler and antecedent question of clearly established law: if a court issues an order of release that results in pretrial detention, must it make the substantive findings and follow the procedures that are required for a transparent order of pretrial detention?

*Mathews* factors establishes that a court issuing a valid order of pretrial detention must inquire into ability to pay and, if the person cannot pay the amount required, must provide basic procedural safeguards including an adversarial hearing with notice, opportunity to be heard and to confront evidence, and findings on the record that no alternative to pretrial detention could reasonably serve the government's interests.[17]

### 1. The government must conduct an inquiry into ability to pay and make on-the-record findings as to whether the person can pay the sum required

As the Supreme Court in *Bearden*, the Fifth Circuit in *Pugh*, and the Southern District of Texas in *ODonnell* have held, if the government seeks to require an arrestee to pay a secured financial condition of pretrial release, due process requires, first, that the court inquire into the person's ability to pay and make findings on the record as to whether the person has the ability to pay. *See Bearden*, 461 U.S. at 673 (holding that, before the state can revoke a person's probation, it must inquire into whether the person's failure to pay was willful); *Turner v. Rogers*, 564 U.S. 431 (2011) (applying the *Mathews* test and holding that, before the state may jail a person for failing to pay child support, the government must provide notice that ability to pay is a critical issue, an opportunity to be heard on the issue, and "an express finding by the court that the defendant has the ability to pay"); *United States v. Payan*, 992 F.2d 1387, 1396 (5th Cir. 1993) (explaining that before a person's probation can be revoked for nonpayment the "court must inquire into the reasons for the failure to pay"); *United States v. Scales*, 639 F. App'x 233 (5th Cir. 2016); *ODonnell*, 251 F. Supp. 3d at 1143–44 (explaining that Harris County's automatic use of

---

[17] Due process requires other protections, including that the government provide an arrestee it seeks to preventively detain with the assistance of counsel, that the court apply the clear-and-convincing evidentiary standard to any findings of dangerousness or flight risk, and that the evidence that provides the basis for those findings be reliable. Because Defendants' existing policies and practices are clearly unconstitutional given the lack of any meaningful hearing or consideration of alternatives to money bail, this Court need not yet reach, and Plaintiffs do not brief, Plaintiffs' other claims about the minimum procedures required required at a hearing that results in pretrial detention, including counsel and the application of a heightened evidentiary standard.

secured money bail, without an inquiry into ability to pay, presents an intolerably high risk of erroneous deprivation of a fundamental right, and that the state's interest in not providing due process is minimal or nonexistent); *id.* at 1161 (requiring an inquiry into ability to pay and notice to arrestees about the significance of the financial information they are asked to provide).

### 2. If the person cannot afford to pay the sum required for release, the government must provide additional procedures to ensure the accuracy of the pretrial detention decision

The substantive rights to pretrial liberty and against wealth-based detention require rigorous process to ensure that the balancing of the government's compelling interest with the individual's "fundamental" interest in liberty is accurate, and that pretrial detention is ordered only when necessary. Under the three-part balancing test set forth in *Mathews*, the government must provide the following procedural safeguards: (1) notice of the critical issues to be decided; (2) an adversarial hearing at which the arrestee has an opportunity to present evidence and to confront the evidence offered by the government; (3) an impartial decisionmaker; and (4) findings on the record by the court, after meaningful consideration of alternative less-restrictive conditions and the evidence presented that detention is the only way to reasonably assure the arrestee's appearance or the safety of the community before trial. These procedures are necessary to ensure that preventive pretrial detention of the presumptively innocent remains the "carefully limited exception." *Salerno*, 481 U.S. at 746 (citing *Mathews*, 424 U.S. at 335).[18]

---

[18] In recent amicus briefs, the Conference of Chief Justices, whose memberships consists of the highest judicial officer of every American state and territory, the United States Department of Justice, and the American Bar Association have all expressed agreement with the basic principle that indigent arrestees are entitled to *Salerno*'s substantive findings and procedural safeguards prior to de facto detention based on a financial condition they cannot afford. *See* Brief of Conference of Chief Justices as *Amicus Curiae* at 38, *ODonnell v. Harris Cnty.*, No. 17-20333, 2017 WL 3536467 (5th Cir. Aug. 9, 2017) ("An indigent defendant deprived of pretrial liberty is no less entitled to the safeguards of due process."); Brief of United States as *Amicus Curiae* at 26, *Walker v. City of Calhoun*, No. 17-13139 (11th Cir. Aug. 9, 2017) (arguing that deprivation of liberty must not be based solely on inability to pay, but rather on an individualized assessment of risk and finding of no other adequate alternative); Brief for American Bar Association as *Amicus Curiae* at 25, *ODonnell*, No. 17-20333, 2017 WL 3536469 (5th Cir. Aug. 9, 2017) (arguing bail systems

The Supreme Court's discussion of the procedures required by the Bail Reform Act supports this conclusion. In *Salerno*, the Court focused on three basic principles in upholding the Act's authorization of preventive detention based on dangerousness: First, pretrial detention was contemplated only in cases involving "the most serious of crimes," *id.* at 747, for only in such cases could the balance of interests that might permit deprivation of an individual's "fundamental" right conceivably tilt in the government's favor.[19] Second, the Act required that an order of pretrial detention, as discussed above, must be accompanied by a substantive finding that there is no alternative short of complete incapacitation to meet a compelling government interest. *Id.* at 750. Third, and most relevant here, an order of detention may be issued only after the provision of robust procedural safeguards, including: a "full-blown adversary hearing," *id.* at 750 and "written findings of fact and a written statement of reasons for a decision to detain." *Id* at 752.

### a. The government must provide notice, an adversarial hearing, an impartial decisionmaker, and findings on the record

The basic due process requirements prior to the deprivation of any liberty interest are well established. Most of them apply even in the post-conviction context, where a person's liberty interest is less than that of the Named Plaintiffs, who are presumptively innocent. In *Gagnon v. Scarpelli*, 411 U.S. 778, 786 (1973), the Court explained what due process requires at a probation revocation hearing for a person whose liberty interest has been diminished by a criminal conviction: (a) "notice" of the critical issues to be decided at the hearing; (b) "disclosure" of the evidence presented by the government at the hearing; (c) an "opportunity to be heard in person and to present witnesses and documentary evidence"; (d) "the right to confront and cross-examine

---

that penalize persons who cannot afford to pay money bail with pretrial detention cannot satisfy *Salerno*'s due process requirements).

[19] Plaintiffs do not argue for preliminary relief on this basis in this Motion. At the appropriate time, Plaintiffs will ask this Court to hold that the pretrial detention of arrestees charged with non-violent misdemeanor offenses is categorically prohibited by the federal Constitution. *See* Compl., ECF No. 1, Count III.

adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation)"; (e) a "neutral and detached" [factfinder]; and (f) a "written statement" of findings and reasons and "the evidence relied on." *See also Morrissey v. Brewer*, 408 U.S. 471, 488–89 (1972) (holding that "the minimum requirements of due process" require the same six procedural protections in the context of parole revocation of a convicted and sentenced person); *Turner*, 564 U.S. at 447 (requiring "notice to the defendant that 'ability to pay' is a critical issue"); *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972) ("Parties whose rights are to be affected are entitled to be heard."); *Concrete Pipe & Prods. v. Constr. Laborers Pension Tr.*, 508 U.S. 602, 617 (1993) ("[D]ue process requires a 'neutral and detached judge in the first instance.'"); *Morrissey*, 408 U.S. at 487 (requiring a statement of reasons for parole revocation); *Wolff v. McDonnell*, 418 U.S. 539, 565 (1974) (requiring a statement of reasons for revocation of good time credits).

Because a pretrial bail hearing implicates the fundamental right to liberty before trial and conviction, each of these basic protections is required. And although the formal rules of evidence need not apply at such hearings, the evidence on which the court bases a detention decision must meet basic minimum constitutional standards of reliability.[20]

### E.  Defendants failed to provide the substantive findings and procedural protections required for a valid order pretrial preventive detention

Because the Named Plaintiffs are impoverished, the secured financial conditions of release that Defendants automatically require after arrest are functioning instead as detention orders. But Defendants made no inquiry into or findings concerning the Named Plaintiffs' ability to pay.

---

[20] Although the formal rules of evidence need not apply at detention hearings, the findings of "clear and convincing evidence" on which the government relies for the complete incapacitation of a presumptively innocent person must meet minimal standards of reliability. *See, e.g.*, *United States v. LaFontaine*, 210 F.3d 125, 131 (2d Cir. 2000) ("while the informality of bail hearings serves the demands of speed, the magistrate or district judge must also ensure the reliability of the evidence, by selectively insisting upon the production of the underlying evidence or evidentiary sources where their accuracy is in question."); *United States v. Accetturo*, 783 F.2d 382, 389 (3d Cir. 1986); *United States v. Acevedo–Ramos*, 755 F.2d 203, 207-08 (1st Cir. 1985).

Defendants did not consider alternative conditions of release. Defendants did not make findings on the record about Plaintiffs' alleged dangerousness or flight risk, or the availability and sufficiency of less-restrictive alternatives to mitigate such an unarticulated risk. Nor did Defendants employ any legal standard or procedures, let alone the heightened standards and robust procedures required by law. Therefore, the Plaintiffs are detained in violation of the Constitution.

### F.  Dallas County Has Simple, Constitutional Alternatives to Jailing the Poor

All over the country, jurisdictions have instituted simple alternatives to the unlawful system of jailing the poor and freeing the rich after arrest. For example, in Clanton, Alabama, after being confronted with a similar federal suit in January 2015, the city adopted a new policy of releasing all arrestees on a $500 unsecured bond, *see Jones ex rel. Varden*, 2015 WL 5387219, and in April 2017, the federal court in Houston ordered Harris County to release impoverished arrestees who cannot afford secured money bail on unsecured bond. *ODonnell*, 2017 WL 1735453.

Other states have voluntarily made changes without federal court intervention. For example, in Washington, D.C., arrestees are released on recognizance with appropriate non-financial conditions.[21] *See* D.C. Code § 23-1321. In July 2017, the Chief Judge of the Circuit Court for Cook County, Illinois, issued an order prohibiting judges from using money bail to detain arrestees, and requiring any judge who imposes a secured financial condition to make a finding on the record that the individual "has the present ability to pay" the sum.[22] Since the order took effect

---

[21] The federal government and the District of Columbia both removed money bail virtually entirely from their court systems after the Department of Justice, Congress, and an overwhelming consensus of legal experts concluded that the old system of post-arrest detention based on money bail was fundamentally unfair and unconstitutional. Federal law now explicitly forbids obtaining post-arrest detention through the use of money bail that a person cannot meet. *See* 18 U.S.C. § 3142(c)(2) ("The judicial officer may not impose a financial condition that results in the pretrial detention of the person.").

[22] The Order is available at http://www.cookcountycourt.org/Manage/DivisionOrders/ViewDivisionOrder/tabid/298/ ArticleId/2562/GENERAL-ORDER-NO-18-8A-Procedures-for-Bail-Hearings-and-Pretrial-Release.aspx.

in September, the daily jail population has decreased by 1,500 people.[23] Moreover, 93% of felony arrestees who have been released were arrest-free as of November 30, and 90% appeared for all scheduled court dates.[24] In February 2017, the Judges of the highest court in Maryland issued a similar Order, prohibiting Judges from requiring secured financial conditions of release that result in detention due to inability to pay.[25] And a year ago, in January 2017, New Jersey virtually eliminated the use of money bail. Since then, the detained pretrial population has dropped by 34%.[26]

The Constitution guarantees that the poor will not face a different criminal legal system than the system faced by wealthier people. Dallas County is free to choose among a variety of options without offending the Fourteenth Amendment, but Dallas County's wealth-based post-arrest detention scheme makes a mockery of the "carefully limited" circumstances, *Salerno*, 481 U.S. at 755, in which the Constitution permits the pretrial detention of a presumptively innocent person. Because the Named Plaintiffs and the similarly situated impoverished arrestees they represent are being, or will be, detained based solely on their inability to pay the generic amount of money set by Dallas County's bail schedule, they are highly likely to prevail on the merits of their constitutional claim.

### III.    Absent an Injunction, Plaintiffs and Class Members Will Suffer Irreparable Harm, the Requested Relief Will Not Harm Defendants, and the Issuance of an Injunction Will Serve the Public Interest

---

[23] Bernie Tafoya, *Cook County Jail Population Sees a Record Low*, CBS Chi., Dec. 22, 2017, available at http://chicago.cbslocal.com/2017/12/22/cook-county-jail-population-record-low/.

[24] Mean Crepeau, *Cook County Jail Drops Below 6,000 Inmates to Lowest Level in Decades*, Chi. Trib., Dec. 22, 2017, available at http://www.chicagotribune.com/news/local/breaking/ct-met-cook-county-jail-under-6000-inmates-20171221-story.html.

[25] The Maryland Court of Appeals' Order is available at http://mdcourts.gov/rules/rodocs/ro192.pdf.

[26] Brentin Mock, *How New Jersey in Leading the Post-Bail* Revolution, CityLab, Nov. 2, 2017, available at https://www.citylab.com/equity/2017/11/how-new-jersey-is-leading-the-post-bail-revolution/544691/.

## A. Irreparable Harm

Without intervention from this Court, the Plaintiff class will continue to suffer the serious and irreparable harm of being jailed. Imprisoning a human being in a jail cell in violation of her constitutional rights is undoubtedly an irreparable harm to her body and her mind. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas*, 533 U.S. at 690; *Foucha*, 504 U.S. at 80. Even one additional night in jail is a harm to a person that cannot be later undone. *See, e.g.*, *United States v. Bogle*, 855 F.2d 707, 710–11 (11th Cir. 1988) (holding that the "unnecessary deprivation of liberty clearly constitutes irreparable harm"); *ODonnell*, 251 F. Supp. 3d at 1157 ("[T]he plaintiffs' injury [illegal pretrial detention] is irreparable."); *Rodriguez*, 2015 WL 923982 (finding irreparable harm because plaintiffs were unconstitutionally deprived of their liberty when the defendants "jail[ed] [them] on secured money bonds without an indigency inquiry"); *Walker*, 2016 WL 361612, at *14 (holding that detention due to inability to pay money bail "constitutes irreparable harm").[27]

In addition to the loss of physical liberty, which has a special status in the American constitutional order, the related consequences of detention prior to trial are devastating. People detained prior to trial lose their jobs, lose their housing and shelter, are cut off from their children and families, are deprived of vital mental health and medical treatment, and are exposed to violent conditions and infectious disease in overcrowded jails.[28] *Barker v. Wingo*, 407 U.S. 514, 532–33

---

[27] *Wanatee v. Ault*, 120 F.Supp.2d 784, 789 (N.D. Iowa 2000) ("[U]nconstitutional incarceration generally constitutes irreparable harm to the person in such custody."); *see also S.E.C. v. Bankers Alliance Corp.*, No. 95-CV-0428, 1995 WL 317586, *3 (D.D.C. May 10, 1995); *Lake v. Speziale*, 580 F. Supp. 1318, 1335 (D. Conn. 1984); *Cobb v. Green*, 574 F.Supp. 256, 262 (W.D. Mich. 1983). Each jailing also carries with it numerous other indignities for each Class member, including intrusive body searches and cramped, crowded, and unsanitary living conditions.

[28] *See* Ram Subramanian et al., *Incarceration's Front Door: The Misuse of Jails in America*, Vera Institute of Justice 17–18 (Feb. 2015) (discussing unsanitary conditions in jails as well as harm to families and communities that results

(1972) ("The time spent in jail awaiting trial has a detrimental impact on the individual. It often means loss of a job; it disrupts family life; and it enforces idleness. Most jails offer little or no recreational or rehabilitative programs. The time spent in jail is simply dead time.").  To take just two examples, Named Plaintiff Erriyah Banks is unable to care for her disabled mother, and her medical care has been interrupted; and Named Plaintiff Shakena Walston is worried she will miss the course enrollment period for the community college program she is starting this semester.

Moreover, pretrial detention interferes with the opportunity to participate in one's defense and leads to higher rates of guilty pleas. *See, e.g.*, *ODonnell*, 251 F. Supp. 3d at 1105, 1143 ("[M]isdemeanor defendants in Harris County who are detained until case disposition are convicted at higher rates and given sentences twice as long as those released before trial. They plead guilty at rates much higher than those who are able to secure early release from pretrial detention."); United States Department of Justice, Statement of Interest at 12, *Varden et al. v. City of Clanton*, 15-CV-34, ECF No. 26 (M.D. Ala. Feb. 13, 2015) ("[I]f a defendant is locked up, he is hindered in his ability to gather evidence, contact witnesses, or otherwise prepare his defense." (quoting *Barker*, 407 U.S. at 532–33 (emphasis added)));[29] *Van Atta v. Scott*, 613 P.2d 210, 215 (Cal. 1980),  ("[T]he fact that the detainee is frequently brought to the courtroom in jail clothing, in handcuffs or otherwise in obvious custody—as opposed to entering freely with counsel and perhaps his family—often engenders subtle prejudices in the judge and jury that necessarily interfere with the detainee's right to a fair trial."). Pretrial detention also increases the likelihood of conviction, the likelihood a person will be sentenced to jail, and the length of the sentence.

---

from pretrial detention) *available at* http://www.safetyandjusticechallenge.org/wp-content/uploads/2015/01/incarcerations-front-door-report.pdf.

[29] *Available at* https://www.justice.gov/file/340461/download.

Christopher T. Lowenkamp et al., *Investigating the Impact of Pretrial Detention on Sentencing Outcomes* 4 (Nov. 2013) (finding those detained for the entire pretrial period are more likely to be sentenced to jail and prison—and receive longer sentences—than those who are released at some point before trial or case disposition).[30]

Because of the destabilizing effects of pretrial detention, research shows that those kept in jail for even a few days prior to trial are significantly more likely to fail to appear in court and to commit crime in the future. *See, e.g.*, Paul Heaton et al., *The Downstream Consequences of Misdemeanor Pretrial Detention*, 69 Stan. L. Rev. 711, 768 (2017) (concluding, after reviewing hundreds of thousands of cases, that detention for even brief periods because of inability to pay money bail led to higher rates of conviction, longer sentences, and a greater likelihood of commission of new crimes in the future); Arpit Gupta et al., *The Heavy Costs of High Bail: Evidence from Judge Randomization* 21 (2016) ("Our results suggest that money bail has a negligible effect or, if anything, increases failures to appear.");[31] Christopher T. Lowenkamp et al., *The Hidden Costs of Pretrial Detention* 4 (2013) ("The longer low-risk defendants are detained, the more likely they are to have new criminal activity pending trial.").[32]

Pretrial detention also exposes arrestees to unsanitary conditions, infection, and other medical and safety emergencies prevalent in Texas jails.[33] The Dallas County Jail—the second

---

[30] Available at http://www.arnoldfoundation.org/wp-content/uploads/2014/02/LJAF_Report_state-sentencing_FNL.pdf.

[31] Available at http://www.columbia.edu/~cjh2182/GuptaHansmanFrenchman.pdf.

[32] *Available at* https://www.pretrial.org/download/research/The%20Hidden%20Costs%20of%20Pretrial%20Detention%20-%20LJAF%202013.pdf.

[33] *See, e.g.*, Bureau of Justice Statistics, *Sexual Victimization In Prisons and Jails Reported By Inmates, 2011-12-Update*, available at http://www.bjs.gov/index.cfm?ty=pbdetail&iid=4654 (finding that 3.2% of jail inmates reported being sexually abused during their current stay in jail).

largest jail in Texas and one of the largest in the nation—is notorious for its inhumane and life-threatening conditions. Between January 2012 and the present, 21 people died while in pretrial custody in the Dallas County Jail. There is a documented history of inmate abuse by jail guards, deaths and suicides in the jail,[34] inadequate training of jail staff, and lack of access to medications and medical services.

The Plaintiffs ask this Court to enjoin Dallas County, pending a final resolution of this case on the merits, from keeping them in jail because they cannot afford to pay cash up front to secure their release. The harm is irreparable, ongoing, and in urgent need of redress. *See ODonnell*, 260 F. Supp. 3d at 821 (denying Defendants' motion to stay preliminary injunction because "[t]ime is of the essence. Every day brings about the incarceration of another hundred indigent misdemeanor defendants, in violation of the Constitution.").

## B.  Public Interest

An injunction will serve the public interest. As numerous courts have emphasized, "It is always in the public interest to prevent the violation of a party's constitutional rights." *Simms v. District of Columbia*, 872 F. Supp. 2d 90, 105 (D.D.C. 2012) (quoting and citing cases); *Giovani Carandola v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002) ("[U]pholding constitutional rights surely serves the public interest."); *G & V Lounge v. Mich. Liquor Control Comm.*, 23 F.3d 1071, 1079 (6th Cir. 1994) ("[I]t is always in the public interest to prevent the violation of a party's

---

[34] An analysis of the Texas Attorney General's Custodial Death Report revealed that at least 20 people died while in pretrial custody at the Dallas County Jail between January 1, 2012, and November 19, 2017. *See* Custodial Deaths Report, available at https://oagtx.force.com/cdr/cdrreportdeaths, and Dallas County Felony and Misdemeanor Courts Case Information, available at https://www.dallascounty.org/criminalBackgroundSearch/captcha. *See also* Cary Aspinwall & Stephanie Lamm, *Unresponsive: Women Are Going to Jail in Need of Drug and Alcohol Treatment. Help Often Comes Too Late*, Dall. Morning News, Dec. 17, 2017, available at https://interactives.dallasnews.com/2017/unresponsive/; Naomi Martin, *Brutal Killing Inside Dallas County Jail Leaves Experts Asking Whether It Could Have Been Prevented*, Dall. Morning News, Jan. 7, 2017, available at https://www.dallasnews.com/news/dallas-county/2017/01/07/brutal-killing-inside-dallas-county-jail-leaves-experts-asking-whether-prevented.

constitutional rights."); *ODonnell*, 251 F. Supp. 3d at 1159 (quoting *Simms*, 872 F. Supp. 2d at 105).

Nor would an injunction harm the Defendants. The County already offers release to every arrestee in the Plaintiff class—but only if they can pay for it. At worst, the County would be required to do what other cities and counties throughout the country do every day: treat both rich and poor alike after arrest without requiring the poor to remain in jail just because they cannot afford to purchase their release, and make rigorous findings about those arrestees who pose such a risk that they cannot be released under any conditions. Indeed, continuing to keep impoverished arrestees in jail cells because of their poverty has significant negative consequences for the public interest. The overwhelming consensus of experts is that communities are safer when they do not needlessly detain the poor. *See* Heaton, 69 Stan. L. Rev. at 741–69 (finding that pretrial detention due to inability to pay money bail causes crime; over the period studied, Harris County could have avoided 1,600 felonies and 2,400 misdemeanors by releasing those individuals who were held, between 2008 and 2013, on $500 money bail); *see also* Schnacke, *supra* note 3, at 28–29.[35]

Moreover, it is enormously expensive to house people in jail.[36] Jailing the poor devastates lives by disrupting stable employment and child custody arrangements. It exacerbates poverty, and

---

[35] *See also, e.g.*, Christopher T. Lowenkamp, *supra* note 32 at 3 (studying 153,407 defendants and finding that "when held 2-3 days, low risk defendants are almost 40 percent more likely to commit new crimes before trial than equivalent defendants held no more than 24 hours"); Arnold Foundation, *Pretrial Criminal Justice Research Summary* 5 (2013) available at http://www.arnoldfoundation.org/wp-content/uploads/2014/02/LJAF-Pretrial-CJ-Research-brief_FNL.pdf (finding that "low-risk defendants held 2-3 days were 17 percent more likely to commit another crime within two years" and that those detained "4-7 days yielded a 35 percent increase in re-offense rates.").

[36] *See* Vera Institute of Justice, *The Price of Jails: Measuring the Taxpayer Cost of Local Incarceration* (2015), available at https://storage.googleapis.com/vera-web-assets/downloads/Publications/the-price-of-jails-measuring-the-taxpayer-cost-of-local-incarceration/legacy_downloads/price-of-jails.pdf (explaining that even the reported costs of approximately $50 to $570 per inmate per day in custody at local jails around the country was a significant underestimate of the cost to local jurisdictions of incarceration in local jails). It costs Dallas County $225,321 *per day*—or $82.2 million per year—to incarcerate presumptively innocent people in the Dallas County Jail. *See Dallas County, Texas, Adult Criminal Justice Data Sheet*, Texas Criminal Justice Coalition (2016), available at https://www.texascjc.org/system/files/publications/Adult%20Dallas%20County%20Data%20Sheet%202016_0.pdf.

makes it more likely that an arrestee will recidivate.[37] *See id.* at 24–29;[38] *see also, e.g.*, Int'l Ass'n of Chiefs of Police, Resolution (October 2014), 121st Annual Congress at 15–16 ("[D]efendants rated low risk and detained pretrial for longer than one day before their pretrial release are more likely to commit a new crime once they are released, demonstrating that length of time until pretrial release has a direct impact on public safety.").[39] As in *ODonnell*, "[t]his factor weighs strongly in favor of granting the plaintiffs' request for relief." 251 F. Supp. 3d at 1159.

## IV.    The Court Should Use Its Discretion Not to Require the Posting of Security

Federal Rule of Civil Procedure 65(c) normally requires the moving party to post security to protect the other party from any financial harm likely to be caused by a temporary injunction if that party is later found to have been wrongfully enjoined. Rule 65(c), however, vests the district court with broad discretion to determine the amount of security required, or to waive the bond requirement. *City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*, 636 F.2d 1084, 1094 (5th Cir. 1981); *see also ODonnell*, 251 F. Supp. 2d at 1159–60 (waiving the bond requirement). This Court should waive the bond requirement because all members of the plaintiff class are indigent, *Wayne Chem. v. Columbus Agency Serv. Corp.*, 567 F.2d 692, 701 (7th Cir. 1977) (requiring no bond for

---

[37] For all of these reasons, as well as the issues of fundamental fairness that render pretrial poverty-based custody unconstitutional, opposition to the routine use of generic bail schedules has been incorporated into the policy positions of the major American law enforcement stakeholders. *See, e.g.*, National Sheriffs' Association, Resolution 2012-6 ("[A] justice system relying heavily on financial conditions of release at the pretrial stage is inconsistent with a fair and efficient justice system.").

[38] Summarizing the current state of research, the report, Schnacke, *supra* note 3 at 29, concluded:

> [R]esearchers found that low- and moderate-risk defendants held only 2 to 3 days were more likely to commit crimes and fail to appear for court before trial than similar defendants held 24 hours or less. As the time in jail increased, the researchers found, the likelihood of defendant misbehavior also increased. The study also found similar correlations between pretrial detention and long-term recidivism, especially for lower risk defendants. In a field of paradoxes, the idea that a judge setting a condition of bail intending to protect public safety might be unwittingly increasing the danger to the public—both short and long-term—is cause for radically rethinking the way we administer bail.

[39] Available at http://www.theiacp.org/Portals/0/documents/pdfs/2014Resolutions.pdf.

indigent person), and this lawsuit is brought to enforce constitutional rights. *City of Atlanta*, 636 F.2d at 1094 (upholding district court's decision to waive the bond requirement because "plaintiffs were engaged in public-interest litigation, an area in which the courts have recognized an exception to the Rule 65 security requirement."); *ODonnell*, 251 F. Supp. 2d at 1159–60.[40] Moreover, Defendants are unlikely to suffer any harm from an improperly issued injunction requiring them to follow the Constitution, *Steward v. West*, 449 F.2d 324, 325 (5th Cir. 1971) (finding that no injunction bond need be posted when "it is very unlikely that the defendant will suffer any harm"), and Plaintiffs are overwhelmingly likely to succeed on the merits.[41]

## CONCLUSION

---

[40] *See also, e.g.*, Preliminary Injunction Order at 3, *Mitchell v. City of Montgomery*, No. 14-CV-186, ECF No. 18 (M.D. Ala. May 1, 2014) (waiving bond requirement for indigent plaintiffs because they were likely to succeed on the merits and because the City was unlikely to suffer significant financial harm); *Swanson v. Univ. of Hawaii Prof. Assembly*, 269 F. Supp. 2d 1252, 1261 (D. Haw. 2003) (waiving bond requirement for public employees based on ability to pay and because the injunction sought enforcement of constitutional rights); *Johnson v. Bd. of Police Comm'rs*, 351 F. Supp. 2d 929, 952 (E.D. Mo. 2004) (waiving the bond requirement for homeless plaintiffs); *Bass v. Richardson*, 338 F. Supp. 478, 490 (S.D.N.Y. 1971) ("It is clear to us that indigents, suing individually or as class plaintiffs, ordinarily should not be required to post a bond under Rule 65(c)."); *see also* 11A Wright & Miller § 2954 (courts can waive the bond requirement in cases involving poor plaintiffs); *Walker*, 2016 WL 361612; *Rodriguez*, 2015 WL 9239821; *Cooper*, 2015 WL 10013003.

[41] Although this case is a prototypical situation for which the class action vehicle was created, and the class action certification motion was contemporaneously filed with this preliminary injunction motion, this Court need not rule on the Plaintiff's class certification motion or formally certify a class in order to issue preliminary injunctive relief. *See, e.g.*, Newberg on Class Actions § 24:83 (4th ed. 2002) ("The absence of formal certification is no barrier to classwide preliminary injunctive relief."); Moore's Federal Practice § 23.50, at 23-396, 23-397 (2d ed.1990) ("Prior to the Court's determination whether plaintiffs can maintain a class action, the Court should treat the action as a class suit."); *see also, e.g., Lee v. Orr*, No. 13-CV-8719, 2013 WL 6490577, at *2 (N.D. Ill. Dec. 10, 2013) ("The court may conditionally certify the class or otherwise order a broad preliminary injunction, without a formal class ruling, under its general equity powers. The lack of formal class certification does not create an obstacle to classwide preliminary injunctive relief when activities of the defendant are directed generally against a class of persons."); *N.Y. State Nat. Org. For Women v. Terry*, 697 F. Supp. 1324, 1336 (S.D.N.Y. 1988) (holding that "the Court acted in the only reasonable manner it could under the circumstances, ruling on the continuation of [the] temporary restraining order and leaving the question of class certification for another day."); *Leisner v. N.Y. Tel. Co.*, 358 F. Supp. 359, 371 (S.D.N.Y. 1973) ("[R]elief as to the class is appropriate at this time even though when the preliminary injunction motion was heard, the class action had not yet been certified."); *Ill. League of Advocates for the Developmentally, Disabled v. Ill. Dep't of Human Servs.*, No. 13-CV-1300, 2013 WL 3287145, at *4 (N.D. Ill. June 28, 2013) ("At this early stage in the proceedings, the class allegations in the Second Amended Complaint are sufficient to establish Plaintiffs' standing to seek immediate injunctive relief on behalf of the proposed class. At a later stage, we may revisit whether that classwide representation is inappropriate, but until that time, we will preserve the status quo (within the limits set forth in the TRO) with respect to all potential class members."); *Gooch v. Life Investors Ins. Co. of Am.*, 672 F.3d 402, 433 (6th Cir. 2012) ("Simply put, there is nothing improper about a preliminary injunction preceding a ruling on class certification.").

For the foregoing reasons, the Named Plaintiffs seek a Preliminary Injunction on behalf of themselves and a class of similarly situated individuals, requiring Defendants to provide Plaintiffs with an inquiry and findings concerning ability to pay prior to demaning payment of a secured financial condition of relaese, and, if the arrestee cannot afford the payment such that the condition of release will operate to detain, all of the procedures required for issuing a valid order of pretrial detention. Defendants' policies and practices—which result in the pretrial detention of presumptively innocent, impoverished arrestees without the procedures required for issuing an order of detention—are in clear violation of the United States Constitution.

Respectfully Submitted,

/s/ *Elizabeth Rossi*
Elizabeth Rossi* (*Pro Hac Vice* Application forthcoming)
Maryland Attorney No. 1412180090
Alec Karakatsanis (*Pro Hac Vice* Application forthcoming)
D.C. Bar No. 999294
Premal Dharia (*Pro Hac Vice* Application forthcoming)
D.C. Bar No. 484091
Civil Rights Corps
910 17th Street NW, Suite 200
Washington, DC 20006
Tel: 202-599-0953
Fax: 202-609-8030
elizabeth@civilrightscorps.org
alec@civilrightscorps.org
premal@civilrightscorps.org

*Admitted solely to practice law in Maryland; not admitted in the District of Columbia. Practice is limited pursuant to D.C. App. R. 49(c)(3).*

/s/ Trisha Trigilio
Trisha Trigilio
Texas Bar No. 24065179
Andre Segura
N.Y. Bar No. 5021647
American Civil Liberties Union Foundation of Texas
1500 McGowen Street, Suite 250

Houston, Texas 77004
Tel: 713.942.8146
Fax: 713.942.8966
ttrigilio@aclutx.org

/s/ Kali Cohn
Kali Cohn
Texas Bar. No. 24092265
American Civil Liberties Union Foundation of Texas
6440 N. Central Expressway
Dallas, TX 75206
Tel: 214-346-6577
Fax: 713-942-8966
kcohn@aclutx.org

/s/Brandon J. Buskey
Brandon J. Buskey
Alabama Bar Number: ASB-2753-A50B
American Civil Liberties Union Foundation
Criminal Law Reform Project
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 284-7364
Fax: (212) 549-2654
bbuskey@aclu.org

/s/ Susanne Pringle
Susanne Pringle
Texas Bar No. 24083686
springle@fairdefense.org
Emily Gerrick (Application for Admission forthcoming)
Texas Bar No. 24092417
Texas Fair Defense Project
314 E. Highland Mall Blvd., Suite 180
Austin, Texas 78752
Telephone: (512) 637-5220
Facsimile: (512) 637-5224

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

This motion was filed simultaneously with the complaint in this action. This motion and all accompanying exhibits, along with copies of the summons and complaint, will be served on each Defendant by delivery to Professional Civil Process on the same date that the Clerk of Court issues a summons for that Defendant.

By: /s/ *Elizabeth Rossi*
   Elizabeth Rossi* (*Pro Hac Vice* Application forthcoming)
   Maryland Attorney No. 1412180090
   Civil Rights Corps
   910 17th Street NW, Suite 200
   Washington, DC 20006
   Tel: 202-599-0953
   Fax: 202-609-8030
   elizabeth@civilrightscorps.org

   *Admitted solely to practice law in Maryland; not admitted in the District of Columbia. Practice is limited pursuant to D.C. App. R. 49(c)(3).

## CERTIFICATE OF CONFERENCE

This motion was filed simultaneously with the complaint in this action. Plaintiffs assume that this motion will be opposed, and will confer with Defense counsel as soon as counsel files a notice of appearance. Plaintiffs will notify the Court promptly if Defendants do not oppose this motion.

By: /s/ *Elizabeth Rossi*
   Elizabeth Rossi* (*Pro Hac Vice* Application forthcoming)
   Maryland Attorney No. 1412180090
   Civil Rights Corps
   910 17th Street NW, Suite 200
   Washington, DC 20006
   Tel: 202-599-0953
   Fax: 202-609-8030
   elizabeth@civilrightscorps.org

   *Admitted solely to practice law in Maryland; not admitted in the District of Columbia. Practice is limited pursuant to D.C. App. R. 49(c)(3).